1                        - - -
2            UNITED STATES COURT OF APPEALS
               FOR THE THIRD CIRCUIT
3
                         - - -
4
   IN RE:  PETITION OF            :
5  FRESCATI SHIPPING COMPANY,     :
   LTD., AS OWNER OF THE M/T      :
6  ATHOS I AND TSAKOS SHIPPING    :  No. 11-2576
   AND TRADING, S.A., AS MANAGER  :
7  OF THE ATHOS I FOR EXONERATION :
   FROM OR LIMITATION OF          :
8  LIABILITY                      :
9                        - - -
10 UNITED STATES OF AMERICA       :
                                  :
11        vs.                     :  No. 11-2577
                                  :
12 CITGO ASPHALT REFINING         :
   COMPANY; CITGO PETRO           :
13 CORPORATION; CITGO EAST COAST  :
   OIL CORPORATION                :
14
                         - - -
15
          TRANSCRIPT OF ORAL ARGUMENT BEFORE
16          THE HONORABLE THOMAS L. AMBRO
        THE HONORABLE JOSEPH A. GREENAWAY, JR.
17        THE HONORABLE KATHLEEN M. O'MALLEY
              ON SEPTEMBER 20, 2012
18                       - - -
19 Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
20
                         - - -
21
22
23
          VERITEXT NATIONAL COURT REPORTING COMPANY
24               MID-ATLANTIC REGION
             1801 Market Street - Suite 1800
25           Philadelphia, Pennsylvania 19103

Page 2

```
 1   APPEARANCES:
 2
     For the Appellants    BLANK ROME
 3   Frescati Shipping     BY:  JACK A. GREENBAUM, ESQ.
     Co Ltd, et al:        405 Lexington Avenue
 4                         The Chrysler Building
                           New York, NY 10174
 5
 6   For the Appellant     U.S. DEPARTMENT OF JUSTICE
     United States of      BY:  ANNE MURPHY, ESQ.
 7   America:              Appellate Section 7644
                           950 Pennsylvania Avenue, N.W.
 8                         Washington, D.C. 20530
 9
     For the Appellees:    PALMER BIEZUP & HENDERSON
10                         BY:  RICHARD Q. WHELAN, ESQ.
                           190 North Independence Square
11                         West, Suite 401
                           Philadelphia, PA 19106
12
13                            -  -  -
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1              THE COURT:  We'll have our --
2      announce our first case for today:  In Re:
3      Petition of Frescati Shipping Company,
4      Ltd., et al, No. 11-2576, and also United
5      States v. CITGO Asphalt Refining Company,
6      et al, No. 11-2577.
7              Mr. Greenbaum?
8              MR. GREENBAUM:  Yes, sir.
9              THE COURT:  And then we have
10     Ms. Murphy?
11             And Mr. Whelan.
12             MR. WHELAN:  Yes, sir.
13             THE COURT:  Very good.  And
14     you're doing this today instead of
15     Mr. Walker; is that correct?
16             MR. WHELAN:  That's correct, Your
17     Honor.
18             THE COURT:  Okay.
19             MR. GREENBAUM:  Good morning.
20     May it please the Court, my name is Jack
21     Greenbaum.  I represent the Appellants,
22     Frescati Shipping Company and Tsakos
23     Shipping and Trading.  I would like to
24     reserve three minutes for rebuttal.
25             THE COURT:  That's fine.
```

Page 4

1          MR. GREENBAUM:  I intend to

2     address the issues of a berth owner's duty

3     to its business invitees and a charterer's

4     warranty of safe port and safe berths.

5          I understand the Government

6     counsel may have something to say about the

7     warranty and, of course --

8          THE COURT:  What is -- what is --

9     I mean, in the chain here, the one that's

10    not here is Star Tankers.  What is the

11    status of the arbitration relating to Star

12    Tankers?

13         MR. GREENBAUM:  That's been

14    stayed, stayed pending the outcome of this

15    case.

16         THE COURT:  Okay.  Go ahead.

17         MR. GREENBAUM:  Okay.  The first

18    question before the Court, before any

19    Court dealing with a safe approach is what

20    is the approach, and that is a question of

21    fact, which is unique in each case.

22         The District Court's error of law

23    in this case was to ignore the facts and to

24    hold that an approach is limited to the

25    immediate vicinity of the --

Page 5

1                    THE COURT:  So what's the

2      limiting --

3                    MR. GREENBAUM:  -- berth.

4                    THE COURT:  What's the limiting

5      principle you would put on the definition

6      of "approach"?

7                    MR. GREENBAUM:  The -- it's the

8      actual approach or, in the words of several

9      of the cases that we've cited, it's the

10     waters that a vessel customarily must

11     transit to get to the berth.

12                    In the case of a river berth,

13     such as the one we're concerned with, it's

14     the transit from the upriver channel to the

15     berth.

16                    I would just --

17                    THE COURT:  So in your case, in

18     this case, you would put -- I better lean

19     back -- you would put everything outside

20     the channel into the approach?

21                    MR. GREENBAUM:  Well, everything

22     doesn't mean much.  It's -- it's the --

23     it's 2,000 feet from the channel to CARCO's

24     berth and about 1,000 feet width of the

25     channel.  That's --

Page 6

1          THE COURT:  Do I understand it

2     correctly, am I analyzing it correctly,

3     that the approach is a subset of the

4     anchorage?

5          MR. GREENBAUM:  It's a section/a

6     pathway through the anchorage, yes.

7          THE COURT:  Okay.  That's

8     correct.

9          MR. GREENBAUM:  Okay?  I just

10     wanted to point --

11          THE COURT:  So is what you're

12     saying that the minute you turn, in this

13     case, to starboard and the tugs take over,

14     that begins the approach?

15          MR. GREENBAUM:  That would be my

16     position, but I would add that if you

17     want -- if the Court felt there was some

18     other place to start, it's, I think,

19     clear as it can be that when a ship

20     is being pushed sideways by tugs,

21     she's on her approach and therefore she's

22     in the approach.  There's no difference

23     between "on" and "in" in this case.

24     And the ship was being pushed sideways

25     by tugboats when she struck the

1    anchor.

2              But just coming back to the

3    Judge's definition of "approach," I wanted

4    to point out that this Court has actually

5    distinguished between the immediate

6    vicinity of a berth and the approach.  In

7    the Nautilus case what the Court wrote was:

8    "A wharfinger also has a duty to maintain a

9    safe approach.  However, there is no duty

10   to ensure safe surroundings or warn of

11   hazards merely in the vicinity."

12             THE COURT:  What's -- what's your

13   counter to the argument of your opposing

14   colleague that the approach can't be

15   anything more than that which CARCO has a

16   permit for dredging?

17             MR. GREENBAUM:  Because a permit

18   for dredging has nothing to do with

19   anything.  The permit for dredging is just

20   that, it's a permit for dredging.

21             The fact that the ship was in

22   federal project waters does not, per se,

23   relieve a berth owner from its common law

24   duty to inspect and warn its business

25   invitees of hazards and that -- federal

1    project waters simply means an area where

2    the Government dredges.  In all other

3    respects, federal anchorage is the same as

4    any other federal -- sorry -- the same as

5    any other navigable waterway, which is

6    subject to the federal jurisdiction for

7    various specified purposes, specified under

8    the Code of Federal Regulations, which does

9    not include searching for hazards.

10             And this is true of the pathway

11   from the channel to the edge of the

12   anchorage as it is from the edge of the

13   anchorage to the berth.

14             THE COURT:  Why isn't it fair for

15   them to rely upon the Government, who does

16   have at least some level of control over

17   that area, to search for any dangers that

18   might exist?

19             MR. GREENBAUM:  Well, as a matter

20   of law they had no right to rely because,

21   in fact, the Government has no duty to do

22   as you've suggested and it does not, in

23   fact, do as you've suggested.  And CARCO,

24   in fact, knew or should have known of that.

25   Apart from the fact, ipso facto, the

1      Government doesn't do it, CARCO knew about

2      it.

3                      THE COURT:  You know what?

4      You're right.  But here's the thing:  If

5      the Government doesn't do it and it appears

6      that the custom and practice is that no one

7      else does it who is a berth owner, then why

8      do they necessarily have -- if the

9      Government doesn't have the responsibility,

10     why does the berth owner now have the

11     responsibility?

12                     MR. GREENBAUM:  Because CARCO

13     makes use, commercial use, of this pathway.

14     They know this pathway is the only way to

15     get to the berth.  They know their invited

16     vessels are going to come down this

17     pathway.  They have a common law duty --

18                     THE COURT:  But no -- but to what

19     extent do we give as a factor custom and

20     practice that it appears that -- at least I

21     saw nothing in the record that no one who

22     is a berth owner does this, goes out and

23     does a -- some type of very in-depth

24     inspection of the approach to its berth?

25                     MR. GREENBAUM:  Well, we don't

1      know that from the evidence.  There's no

2      evidence that --

3               THE COURT:  But --

4               MR. GREENBAUM:  -- berth --

5               THE COURT:  You may be right.  We

6      don't know for sure.

7               MR. GREENBAUM:  But if we assume

8      that, if we assume that.

9               THE COURT:  But what we do --

10     what we have on the record is there's

11     nothing in there --

12              MR. GREENBAUM:  It's probably

13     the -- it's probably the case.  They do

14     certainly survey for depth because you have

15     to survey for depth before you dredge, and

16     we know that they do dredging in the --

17     right up to the federal channel in many

18     cases, as I've cited in our reply brief,

19     and in one case right through Federal

20     Anchorage No. 16.  So we know they survey.

21              And we know that the federal ---

22              THE COURT:  This is 9; right?

23              MR. GREENBAUM:  This is 9.  But

24     we're talking generally about the rights

25     and prohibitions and the practices of

1    terminals doing work in a federal

2    anchorage, doing certain work in a federal

3    anchorage, surveying.

4              THE COURT:  I'm somewhat

5    concerned about our standard of review

6    here.  I mean, you all debate.  Obviously

7    you claim that this is a question of law as

8    to what constitutes an anchorage.  Your

9    opponents --

10             MR. GREENBAUM:  An approach.

11             THE COURT:  Approach.

12             THE COURT:  Approach; I'm sorry.

13   Your opponents argue that it's a question

14   of fact.

15             MR. GREENBAUM:  Yes.

16             THE COURT:  And yet it seems to

17   me that you're both wrong and that it's a

18   mixed question of law.

19             MR. GREENBAUM:  It is, and

20   that's -- I don't imply that it's a

21   question of law.  What I said was a legal

22   error was for the Court to ignore the facts

23   and to delimit his definition of an approach.

24   From there on it's a question of fact,

25   which I said in the briefs.

1           In this particular case, though,

2      the record is very well-developed and I

3      think this Court has sufficient information

4      to make a determination that the approach

5      was this pathway through the anchorage

6      because any contrary finding --

7           THE COURT:  Did you all submit

8      findings of fact --

9           MR. GREENBAUM:  -- below would

10     be --

11          THE COURT:  Did you all submit

12     findings of fact and conclusions of law?

13          MR. GREENBAUM:  Yes.

14          THE COURT:  You did?

15          MR. GREENBAUM:  Yes.

16          THE COURT:  So what happened to

17     them?

18          MR. GREENBAUM:  I don't

19     understand.

20          THE COURT:  I mean, the Judge

21     didn't seem to -- I mean, there's a 15-,

22     16-page opinion, but usually what you see

23     is something --

24          MR. GREENBAUM:  Oh, well, we

25     can't -- we can't account for what the

1    Judge has done.

2              THE COURT:  Well, what must

3    specifically occur to trigger a duty on

4    CARCO to survey a particular area?

5              MR. GREENBAUM:  Well, according

6    to Smith against Burnett, it doesn't need a

7    trigger.  There the berth owner is

8    obligated to inspect his berth and the

9    approach to his berth and warn invited

10   vessels of any hazards.

11             If they don't control or own the

12   approach or even the berth in some cases --

13   the berth being the water next to the dock;

14   not the dock itself, not the pier itself --

15   but if they don't own it or control it, it

16   doesn't matter.  The berth owner's not

17   being asked to do anything that requires

18   control.

19             As we've said in the briefs, they

20   were perfectly free to inspect, and that's

21   all they needed to do to carry out their

22   duty.

23             THE COURT:  So the test you're

24   proposing is actual approach?  Is that the

25   language that you're proposing that we use?

1          MR. GREENBAUM:  That or the

2     waters -- to adopt the language in various

3     decisions, the waters that a vessel must or

4     does customarily travel from the upriver

5     channel to the berth.

6          This has got to be a flexible

7     standard because it's a question of fact

8     and it could be different from case to

9     case.  It's certainly going to be different

10    in a harbor than it is in a river.  In a

11    harbor the ship might approach from

12    anywhere, and maybe there is no usual

13    approach in a harbor.

14          THE COURT:  Even if we agree with

15    you, do you have a problem with respect to

16    the issue of proximate cause given the

17    Judge's finding that even if they had

18    exercised care over this area, they would

19    not have found the anchor?

20          MR. GREENBAUM:  Oh, absolutely.

21    That is -- that was clearly erroneous.  All

22    of the evidence was to the contrary.  No

23    evidence whatsoever suggested they would

24    not have found the anchor.  Every sonar or

25    side scan did find the anchor and other

1    objects, including one in 2001 that --

2          THE COURT:  Although supposedly

3    the anchor had been there for how many

4    years?

5          MR. GREENBAUM:  A minimum of

6    three.  There was also an expert affidavit

7    that was stipulated into evidence that said

8    it could have been there longer.

9          THE COURT:  And there was

10    evidence that many, many other ships had

11    gone over that same spot.

12          MR. GREENBAUM:  That's right.

13    And we pointed out, there were 71 ships that

14    went to CARCO's berth in three years, of

15    which I think it was 22 had to have gone

16    there during high water because that was

17    the pilot's requirement for ships with a

18    draft over 37 and a half feet.

19          Another, I think it was, 31 had

20    drafts between 37 feet and 37 and a half feet

21    and probably went across the anchorage in high

22    water because the local -- I think it was

23    the Maritime Advisory Committee recommended

24    that those ships come up the river in the

25    flood tide, the incoming tide, which is a

1    seven-hour trip and would have brought them

2    across from CARCO's berth one hour after

3    high tide, and that -- that's high water,

4    so they went across at high water.

5              And then there were another 18

6    ships, we don't know when they crossed, and

7    we don't know if they touched the anchor.

8              THE COURT:  So is --

9              MR. GREENBAUM:  The anchor could

10   have been touched without causing any

11   damage to ships.

12             THE COURT:  You're saying that

13   determination would be clearly erroneous.

14   Is the record sufficiently developed that

15   that determination could be made on the

16   face of the record and wouldn't turn on

17   credibility determinations if a different

18   judicial officer had to review the record?

19             MR. GREENBAUM:  Credibility?  No,

20   because there was no contrary

21   evidence/testimony/document.  Their own

22   witness said it would be easy to detect the

23   anchor.

24             THE COURT:  All right.  And

25   you're asking that we make that

1    determination?

2                   MR. GREENBAUM:  Yes.

3                   THE COURT:  The draft here was,

4    what, 36.6 or 36.7?  Is that right?

5                   MR. GREENBAUM:  That's right.

6                   THE COURT:  And tell us about the

7    memorandum of November 22, what that did

8    and how it helps or doesn't help your case.

9                   MR. GREENBAUM:  Well, that goes

10   to the misrepresentation claim, and it also

11   demonstrates CARCO's casualness with

12   respect to vessels coming to its pier.

13   CARCO had previously notified vessels,

14   including the ATHOS, that they would be

15   safe coming to the pier at any stage of

16   tide with a draft of 38 feet.  The memo of

17   November 22nd internally changed that

18   within CARCO to a draft of 36 feet.

19                   If the ship had known that, they

20   would not have come in at the beginning of

21   the flood tide, which was otherwise quite a

22   proper procedure, as everybody agreed.

23                   THE COURT:  Yeah.  I understand

24   that you argue that had you known there was

25   any issue, you would have been more

1    careful, you would have waited.  The Court

2    made a finding of fact that that statement

3    wasn't credible, did it not?

4              MR. GREENBAUM:  Well, no.  The

5    Court based its decision on the

6    misrepresentation claim on ignoring a fact.

7              THE COURT:  But, the Court did

8    both.

9              MR. GREENBAUM:  The Court --

10             THE COURT:  The Court said that

11   the area was not within the anchorage so it

12   was irrelevant.

13             MR. GREENBAUM:  Which was

14   incorrect, because the Court simply ignored

15   CARCO's own survey that showed that there

16   were shoals, shallow places, right in front

17   of the berth of 36 feet 3 inches to 36 feet

18   9 inches, which is in some instances

19   shallower than the depth of the ship, at

20   least at mean low water.  These surveys

21   take place at the average low water.

22             So -- and there was plenty of

23   evidence, I think it was eight witnesses I

24   mentioned in the brief, who said they

25   wouldn't have gone in if they had known

1   that.  So --

2                  THE COURT:  They would have

3   stayed out in the channel.

4                  MR. GREENBAUM:  They would have

5   either waited until high water and/or

6   insisted that CARCO take off some of the

7   cargo into a barge -- it's called

8   lightering, that's done all the time -- so

9   that the ship's draft would be reduced.

10                  This is what I call the but-for

11   causation, causation in fact.  The only

12   genuine issue about the misrepresentation

13   claim is proximate cause, and I recognize

14   that proximate cause is often difficult to

15   answer.  It's often sort of a metaphysical

16   debate without a correct answer until the

17   Court decides what the correct answer is.

18                  THE COURT:  On the metaphysics,

19   let me ask you something that hopefully

20   isn't metaphysical.  Are we clear where on

21   the -- I'm not a nautical person, but where

22   on the bottom of the boat the anchorage --

23   the anchor hit and if the boat is like

24   this --

25                  MR. GREENBAUM:  It was the very

Page 20

1    bottom --

2              THE COURT:  -- was it --

3              MR. GREENBAUM:  -- towards the

4    stern.

5              THE COURT:  -- the very bottom or

6    was it on the side?

7              MR. GREENBAUM:  Well, it may have

8    been slightly on the side, but it was

9    basically on the very bottom.  It struck

10   the No. 7 center tank, the cargo tank, and

11   also the No. 7 port ballast tank, and the

12   No. 7 would be basically to the stern of

13   the ship.

14             THE COURT:  Before you sit down,

15   let me ask you a question that I think I

16   want to ask everybody, and that is if

17   the -- if we were to agree with you on the

18   contract claim, which you haven't had a

19   chance to get to yet, but if we were to

20   agree with you on that, is there any reason

21   to reach the tort claim?

22             MR. GREENBAUM:  No.

23             THE COURT:  Are the damages

24   different?

25             MR. GREENBAUM:  No.  No.  No.

Page 21

1    The damages are the same.  The only reason

2    I see to reach the negligence claim is

3    because it's a very important issue to the

4    general public.

5              THE COURT:  And yet that -- I

6    mean, that's what you focus on, the

7    contract claim.  You have a contract

8    between Star and CARCO and you have a

9    contract between Star and Frescati.  The --

10   what shows the intent of CARCO that

11   Frescati be accorded third-party

12   beneficiary privilege?

13             MR. GREENBAUM:  Well, I think

14   that the intent is derived from the

15   language of the contract and the context

16   of -- the context in this particular case

17   includes the fact that CARCO is the berth

18   owner.

19             But the language is plain enough,

20   and I think that the Supreme Court

21   recognized that in the Crumady and the

22   Waterman cases in which --

23             THE COURT:  Well, those are

24   stevedore cases.

25             MR. GREENBAUM:  Those are the

1      stevedore cases.  But the importance of

2      those cases is that the stevedores called

3      into play an unseaworthy condition on the

4      vessel which made the ship owner liable to

5      injured longshoremen. And that negligence

6      on the part of the stevedore was considered

7      to be a breach of the warranty that the

8      stevedore owed to the people who hired

9      them, the charterer and the consignee.

10             The Supreme Court determined that

11     it was manifestly -- they didn't make a

12     long decision out of it, but it was

13     manifestly evident that the intent was to

14     benefit the vessel; and in Waterman the

15     Court said if the intent was to benefit the

16     vessel, it was also to benefit the vessel

17     owner.

18             There's an interesting sidebar, I

19     think, to Crumady.  In the District Court

20     in that case, the Trial Judge found for the

21     ship owner on a theory that there was a

22     direct implied contract of indemnity

23     between the stevedore and the ship owner.

24             Obviously the Supreme Court did

25     not find a direct contract.  But they did

Page 23

1   very deliberately, in view of the

2   alternative, they did very deliberately

3   find there was a third-party beneficiary

4   right in the ship owner.

5            And, of course, the Paragon case

6   in the Second Circuit is much closer on its

7   facts.

8            THE COURT:  The Paragon case is

9   in effect -- I mean, I won't say it -- it

10  reads like a dictum at the end of an

11  opinion.  We see no reason why you can't

12  apply the stevedoring cases from two years

13  and three years respectively before to

14  this.  And then you counter that, you have,

15  a few years later to the Bunge case out of

16  Louisiana where they said, wait a minute --

17           MR. GREENBAUM:  Well, that's

18  another stevedore case.

19           THE COURT:  Yeah.  But you need

20  intent.

21           MR. GREENBAUM:  The -- I don't

22  think the language in Paragon was dictum.

23  It reads like dictum because Paragon had

24  not appealed.  Paragon had recovered a

25  judgment against YPF, which was its own

1    affiliate.

2              THE COURT:  Right.

3              MR. GREENBAUM:  And YPF had

4    recovered a judgment against -- sorry.

5              THE COURT:  No.

6              MR. GREENBAUM:  Paragon recovered

7    a judgment against Republic and Republic

8    had one against YPF.  There was no reason

9    Paragon should appeal.  YPF appealed.

10             YPF argued that there was

11   collusion between Paragon and Republic for

12   Republic not to submit a defense to

13   Paragon's claim.  The reasoning the Court

14   or YPF raised was that it would hide from

15   YPF the fact that there was this foreign

16   company involved as well as an American

17   company because they only -- YPF only

18   waived sovereign immunity for American

19   companies.

20             But, in fact, there is also the

21   unstated point that YPF -- sorry --

22   Republic had no damages of its own.  It

23   didn't own the ship; Paragon did.  So YPF

24   could only recover against -- Republic

25   could only recover against YPF --

1          THE COURT:  Right.  I understand

2     what you're saying.

3          MR. GREENBAUM:  -- if it had an

4     indemnity claim.

5          The Court had to make a ruling on

6     that and the ruling was it didn't matter if

7     there was collusion, it was immaterial,

8     because Paragon had a good third-party

9     beneficiary claim directly against YPF.

10          So it was not dictum.  The

11     wording sounds like it, but only because of

12     the unfortunate state of the proceedings or

13     the procedures; that is, with Paragon not

14     having appealed.

15          THE COURT:  It's interesting,

16     that case is from '62 and I guess Bunge,

17     whatever it was, maybe '74, whatever, I

18     couldn't find a whole lot else beyond those

19     two cases.

20          MR. GREENBAUM:  The reason for

21     that is because almost all charter party

22     cases are arbitrated in New York or London,

23     or lately in Hong Kong as well, but Hong

24     Kong applies English law.  And I don't

25     believe it appropriate to cite arbitration

1      decisions to the Court of Appeals.

2              THE COURT:  Okay.  All right.

3      Thank you very much.

4              MR. GREENBAUM:  Thank you.

5              THE COURT:  Get Ms. Murphy up,

6      please.

7              MS. MURPHY:  May it please the

8      Court, I'm Anne Murphy and I'm here to

9      represent the United States.

10             Your Honors, I'd just like to

11     pick up on this notion that if there's a

12     custom or a practice by all of the terminal

13     owners not to survey into the anchorage

14     ground, that maybe they ought all to be

15     able to rely upon the United States to take

16     care of the anchorage grounds.  That's

17     incorrect both legally and factually.

18            THE COURT:  Didn't the -- but the

19     Trial Judge here said it wasn't the

20     Government's fault; isn't that correct?  I

21     mean, he said it was whoever dropped that

22     anchor, that unknown party, that was the --

23     that was the person or the entity at fault

24     here.  It wasn't the Government's fault.

25           MS. MURPHY:  That's correct, Your

1      Honor.  But in -- and it's true that it

2      wasn't the Government's fault.  But that

3      doesn't mean that other entities shouldn't

4      be at fault and be responsible for making

5      sure that the waterways are clear, even if

6      it happens to be within an anchorage

7      ground.  And if Your Honor --

8                   THE COURT:  But I guess my point

9      is if the Government hasn't been found to

10     be at fault and whatever rights you have as

11     subrogee are going to be attached or

12     identical to those of Frescati, don't you

13     have to wait and see what happens with

14     respect to Frescati?

15                  MS. MURPHY:  Your Honor, this

16     argument that we're making in terms of the

17     anchorage grounds, it's not to appeal some

18     ruling by the District Court that the

19     United States was liable because, as you

20     know, there isn't one.

21                  THE COURT:  Right.

22                  MS. MURPHY:  It's much more to

23     the effect that pretty much you have a

24     whole industry coming in and saying we're

25     not responsible for taking care of -- you

1    know, even if our berth comes through, even

2    if you have to go through the anchorage

3    ground to get to our berth, and there's

4    a -- there's a chart on Page 1258 of the

5    Joint Appendix which makes it really clear

6    how close to the berth the anchorage ground

7    is, and the industry is saying, we rely on

8    the Government to do this and it's just

9    very important for the United States to

10   make sure that everybody know in the

11   industry, in addition to having the

12   Maritime Advisory Committees and the survey

13   reports, that that's not part of the

14   Government's obligation and --

15              THE COURT:  What -- what should

16   we derive from 1258?

17              MS. MURPHY:  Sorry, Your Honor?

18              THE COURT:  I said, what should

19   we --

20              THE COURT:  What should we glean

21   from --

22              THE COURT:  -- derive from 1258?

23              MS. MURPHY:  Well, you can see on

24   Page 1258 that it's a -- you can see where

25   the vessel is and you can see where the

1      anchorage ground is, and one of the things

2      that CARCO says is we don't have a dredging

3      permit, we can't dredge into the anchorage,

4      and the truth is -- and it's unrebutted, I

5      believe -- the Corps will issue the

6      dredging permit for the area that you ask

7      it to dredge.

8              I mean, I'm assuming if there was

9      some issue about dredging into the middle

10     of the channel on a busy day or something,

11     it would be a problem.  But generally it's

12     not the Government that says what you can

13     dredge.  You submit your permit and you ask

14     for it.

15             It happens that this is an

16     unusual terminal because it's so close to

17     the anchorage ground and because, as the

18     testimony said, the vessels have to come

19     through the anchorage to get to the dock.

20     But that doesn't mean that CARCO has any

21     problem getting a dredging permit if they

22     ask for a dredging permit.

23             For a survey you don't have to

24     have a permit of any sort.  You can go and

25     survey.  I mean, the Corps, you know, often

1     wants to know why you are so that it knows

2     where the vessels are.  But there's nothing

3     in the Corps' regulations or the permitting

4     process or anything of that sort that would

5     prevent CARCO from doing that.

6              And I think one of the images

7     they're using is it's like, you know, as if

8     the federal anchorage ground were like a

9     federal post office or a piece of federal

10    property or a parking lot, and it's really

11    not like that at all.

12             There's some regulatory authority

13    to dredge and survey, but basically it's a

14    navigational thing whether this is an area

15    where you can -- you know, if you need to

16    anchor as you're going up and down the

17    river, this is where you would have

18    navigational priority to anchor.

19             THE COURT:  So you're really just

20    making a policy argument to us, almost akin

21    to what you would do if you were an amicus

22    in this proceeding?

23             MS. MURPHY:  Well, not on the

24    contract claims.  We're a party on the

25    contract claims.  But I think -- I think,

1      yes, that's right.  And we do have the

2      issue about the breach of the settlement

3      agreement --

4              THE COURT:  Yeah.

5              MS. MURPHY:  -- as to --

6              THE COURT:  I'm having a hard

7      time following that.  I mean, you say they

8      breached the settlement agreement because

9      they agreed not to bring claims against the

10     Government, but how would that bar them

11     from asserting a defense based on the

12     negligence of the Government as against a

13     claim by Frescati?  That doesn't -- I'm

14     having a hard time following the logic.

15             MS. MURPHY:  I understand that

16     and, Your Honor, that would be completely

17     correct if what they had said was "We don't

18     have a duty.  The Government has a duty."

19             But the way it came up in the

20     District Court was as a supposed defense to

21     the contract claims, and so the request was

22     that the Government forego its contract

23     damages because of its, quote/unquote,

24     exclusive control of the anchorage grounds,

25     so -- and that's really a negligence

1      theory.

2              That's -- you know, you control

3      the anchorage grounds, there was an

4      accident; therefore, you forego your

5      contract damages.

6              And the settlement agreement

7      which is at Page 95 of the Joint Appendix

8      clearly says that they're not going to

9      argue that the Government was negligent and

10     that that should reduce the contract

11     damages.  I mean, it specifically says

12     they're not going to ask the Court to

13     offset or reduce damages because of alleged

14     negligence.

15             But I agree with you, the much

16     more important point at this point,

17     especially given the amicus filings, is to

18     make clear that the Government does not

19     maintain or have exclusive control over

20     anchorage grounds in a sense that would

21     prevent CARCO or any other terminal owner

22     or any other river user from getting a

23     permit to dredge, from surveying, from

24     taking the action --

25             THE COURT:  So are you asking us

1    to actually make a finding that if the

2    Government had been sued on the negligence

3    claims, that the Government wouldn't be

4    liable?

5              MS. MURPHY:  Your Honor, I'm not

6    asking you to engage in a lot of dicta, but

7    I think to the extent that CARCO's negligence

8    claims turn on the notion that we can't

9    possibly have a duty because it took place

10   in an anchorage ground, I'm just here to

11   answer any questions you have about the law

12   that relates to that, the fact that relates

13   to that.  I'm not asking you for any

14   specific ruling.

15             But it was important, even though

16   there's no ruling against the Government,

17   that the United States be heard on this

18   point, I think, to answer the questions and

19   to explain how the river is regulated,

20   because otherwise, you know, based on --

21   you know, otherwise we'd be here and nobody

22   would be here to explain the United States'

23   position.

24             THE COURT:  Thank you very much.

25             THE COURT:  Can I just ask one

1    question about 1258?  The -- what are these

2    squiggly lines for?

3                MS. MURPHY:  I think that was

4    where the survey was.

5                THE COURT:  And the approach is a

6    part of that or a subset of that?

7                MS. MURPHY:  Well, if you see the

8    terminal's up here on the top left.

9                THE COURT:  Yes.

10               MS. MURPHY:  And the vessel had

11   to be swung around and in to lie against

12   the dock.

13               THE COURT:  Okay.  So that whole

14   area from the channel down to where they're

15   doing the berth, that's the approach.

16               MS. MURPHY:  Right.  I mean, the

17   other thing that's getting lost in the

18   weeds here is that it's not very big

19   specifically compared to the size of the

20   vessel.

21               I mean, if the vessel had her

22   stern up against the dock and her nose

23   pointing up into the anchorage, about half

24   of her would be in the anchorage ground.

25   So even though, you know, it looks as

1   though things are in the middle of the

2   anchorage, the actual areas in terms of the

3   size of the vessel are quite small.

4           So I see my time's up.  If Your

5   Honors wanted to hear anything on the

6   contract claims also?

7           THE COURT:  Well, I just had one

8   other question and if it's outside the

9   scope of your expertise, you'll tell me.

10  But does the approach technically change

11  from -- for each vessel that comes in to

12  the anchorage and then comes up to the

13  berth or is the approach always a pretty

14  static area of the anchorage?

15          MS. MURPHY:  I suspect that it

16  depends -- it may depend somewhat on tides

17  and those kinds of things, but there's

18  going to be like an area that is generally

19  traversed by the ships going from the

20  channel to the dock.

21          THE COURT:  Thank you.

22          THE COURT:  Mr. Whelan.

23          MR. WHELAN:  Good morning.

24          THE COURT:  Good morning.

25          MR. WHELAN:  I'm Richard Whelan

1    from Palmer Biezup & Henderson and I'm

2    arguing on behalf of the Appellees in this

3    case, which are collectively referred to as

4    CARCO in the briefs.

5              THE COURT:  Let's start off, what

6    is -- what is the appropriate scope of the

7    approach?

8              MR. WHELAN:  The --

9              THE COURT:  How would you define

10   "approach"?

11             MR. WHELAN:  Your Honor, the

12   approach is defined, and Judge Fullam

13   found, by the geographic scope of the berth

14   area, the immediate berth area, within, for

15   example, in this case, the red triangle.

16             THE COURT:  He talks about the

17   area immediately adjacent.  That seems

18   awfully small when a ship has to turn in

19   the channel to in this case starboard, tugs

20   come on and comes -- approaches the berth.

21             Shouldn't it be from, as the

22   amicus brief of the BIMCO International

23   says, that an approach should be -- means

24   the pathway from the point at which it left

25   the -- the ATHOS I left the Delaware River

1    channel until it reached the CARCO berth?

2                MR. WHELAN:  No, Your Honor.  The

3    approach is set in law.  It's a settled

4    legal standard set forth in the Nautilus

5    case, the Western Bulk case, the Osprey

6    case --

7                THE COURT:  Okay.  The

8    Nautilus -- the Nautilus case was from us

9    in '96; right?

10               MR. WHELAN:  That's correct, Your

11   Honor.

12               THE COURT:  And it has a

13   definition of "approach" in there?

14               MR. WHELAN:  In all of these

15   cases, and even in the plaintiffs' cases,

16   they're taking -- they're trying to expand

17   the definition of "approach."  All of these

18   cases -- take the plaintiffs' cases that

19   they cited -- the ships were -- like Smith

20   versus Burnett, which Mr. Greenbaum --

21               THE COURT:  Well, let's go back

22   to the Nautilus case.  Did our Court give a

23   definition of the word "approach"?

24               MR. WHELAN:  Yes.  It --

25               THE COURT:  On what page?

Page 38

1            MR. WHELAN:  Well, not -- it can

2     be implied from the opinion that the berth

3     owner is only responsible for the immediate

4     berth area, and in all of these cases the

5     approach is --

6            THE COURT:  That's what we said

7     in Nautilus?

8            MR. WHELAN:  The immediate

9     entrance to and exit from the physical dock

10    structure.  And that's why Judge Fullam

11    found, in accordance with Western Bulk,

12    that the approach is limited to CITGO's

13    triangle, which is the --

14            THE COURT:  But --

15            MR. WHELAN:  -- permitted area --

16            THE COURT:  But that's --

17            MR. WHELAN:  -- adjacent to the

18    federal anchorage.

19            THE COURT:  -- not what Judge

20    Fullam said.  What Judge Fullam said is the

21    reason he was making that finding is that

22    you didn't have exclusive control over the

23    anchorage.

24            MR. WHELAN:  That's another

25    factor, Your Honor.

Page 39

1          THE COURT:  That was the only

2     test that he seemed to apply, and then he

3     turned around, in applying that test, said

4     immediate vicinity of the berth.

5               MR. WHELAN:  And --

6          THE COURT:  He didn't -- he

7     didn't say I'm gleaning this from other

8     cases.

9               MR. WHELAN:  Well, he did cite

10     favorably in -- in his decision the Western

11     Bulk case in his definition of what -- of

12     the area that CARCO was responsible for.

13     It had no -- he said, it had no duty with

14     respect to Federal Anchorage No. 9 because

15     those public waters constituted surrounding

16     areas or areas over which CARCO exercised

17     no control.

18

19               MR. WHELAN:  So --

20          THE COURT:  You believe the legal

21     definition of "anchorage" should be the

22     immediate vicinity of the berth.

23               MR. WHELAN:  Of approach, in the

24     immediate -- that's the language that

25     all --

Page 40

1           THE COURT:  I'm sorry; the --

2           MR. WHELAN:  -- of the cases, in

3    the immediate vicinity of the approach; not

4    surrounding areas, not waters in the

5    vicinity.

6

7           And you'll see in

8    Nautilus and all of the other cases,

9    Western Bulk and Osprey, they specifically

10   say you do not guarantee --

11          THE COURT:  The reason I'm asking

12   this is because you argue in your brief

13   that what the Judge made was a finding of

14   fact and that we should not review it de

15   novo, and yet now you're telling me it was

16   a legal conclusion that we should adopt.

17          MR. WHELAN:  It's both because

18   the -- what the -- there is a legal

19   standard that the Judge followed and the

20   facts establish that CARCO only exercised

21   maintenance and control and dredging within

22   the triangular --

23          THE COURT:  Well, if it --

24          MR. WHELAN:  -- area that was

25   adjacent to their physical dock structure.

Page 41

1          THE COURT:  If it's a fact issue,

2     that means that it would be improper for

3     him to -- for Judge Fullam to have

4     disregarded all of the testimony on

5     "approach" that seems to be at odds with

6     what you've said; right?

7          I mean, it appears that

8     throughout the record, the definition of

9     "approach" seems to be more broadly

10    discussed than you've just said.  I mean,

11    you're basically saying it's the area right

12    outside of the berth.

13          MR. WHELAN:  The problem, Your

14    Honors, is the word "approach" can be used

15    in a vessel approaching a dock.  It could

16    be -- it could be 60 miles away approaching

17    a dock.  It's used very loosely in the

18    decisions.

19          You have to focus on the

20    geographic scope of the legal duty, which

21    is where the berth owner had maintenance

22    and control, and in this particular case

23    that area was the red triangle for which --

24          THE COURT:  Well, isn't that a

25    bit --

Page 42

1          MR. WHELAN:  -- CARCO did have a

2     permit.

3          THE COURT:  -- circular?  Isn't

4     that a bit circular? -- I mean, because the

5     approach defines the legal duty, at least

6     as it relates to negligence, and so when

7     you say we have to look at legal duty,

8     you're telling us to look at a different

9     legal duty to then define this duty of

10     care.

11          MR. WHELAN:  No.  The duty of

12     care is limited by geographical scope to

13     the area of the berth that CARCO controlled

14     and maintained, which is that red triangle

15     shown in the exhibits.  And the approach

16     has to be within that area.  All of the

17     cases say that it's the immediate entrance

18     to and exit from the physical dock

19     structure.

20          THE COURT:  Well, let's go --

21          THE COURT:  But how can we focus

22     on the -- on the cases in the first

23     instance when, you know, as Judge O'Malley

24     just said and you seem to agree, initially

25     it's a question that the testimony of the

1       witnesses -- you know, we can go through

2       them, but this is on Page 269 of the

3       Appendix -- we normally think of an

4       approach to a berth as that area after, you

5       know, when you've hooked, connected the

6       tugboats, you've received the docking tugs,

7       and you're starting to maneuver the ship to

8       the berth, and that's what we consider the

9       approach.  Now, is that what you're talking

10      about?

11                  MR. WHELAN:  No, Your Honor.

12      The -- if you use that definition -- and

13      then this is the whole point: that

14      Frescati's trying to take this approach and

15      expand it into public waters, and in this

16      case the tugs actually came alongside the

17      ATHOS I and the docking pilot boarded in

18      Billingsport Range, which was a mile away.

19                  So this -- this would result in

20      exactly what Judge Fullam said.  The

21      approach would necessarily mean all -- the

22      entire passage that the vessel would have

23      to make out to the Delaware River, from the

24      Delaware River all the way in.

25                  THE COURT:  How far is it from

Page 44

1     the berth to the channel?

2              MR. WHELAN:  Excuse me?

3              THE COURT:  I said, how far is it

4     from the berth to the channel?

5              MR. WHELAN:  You have to go

6     through the federal anchorage first.

7              THE COURT:  No; how far, the

8     distance, the distance.

9              THE COURT:  I said how far.

10              MR. WHELAN:  It's about -- it's

11     about --

12              THE COURT:  Is it 900 feet?

13              MR. WHELAN:  Slightly more than

14     900 feet, I would say.

15              THE COURT:  Okay.

16              THE COURT:  All right.  So the

17     definition as it seems to have been framed

18     in what I just read would take us from, you

19     know, at some point at the channel/around

20     the channel edge, through the anchorage, to

21     the berth.  And you're saying that's too

22     broad a definition of "approach"?

23              MR. WHELAN:  Yes, Your Honor.

24     It -- it's -- and then this feeds into,

25     again, the policy issues.  Where does it --

1    where does -- where does this end?  If you

2    expand the legal duty of a berth

3    owner/terminal operator outside the

4    immediate berth area, which is what the

5    case law presently holds, then you -- you

6    open up a whole list of policy issues.  It

7    expands a terminal liability to all vessels.

8              The public -- the anchorage here,

9    Federal Anchorage No. 9, is a public

10   anchorage.  673 vessels from 2000 to

11   2004 --

12             THE COURT:  But --

13             MR. WHELAN:  -- anchored in

14   Federal Anchorage No. 9.

15             THE COURT:  -- let's go back and

16   see if we can just -- I think, if I -- we

17   had agreed at the outset with your opposing

18   counsel that it's -- we have a mixed

19   question of fact and law.  Law would be the

20   definition of what is an approach; is that

21   correct?

22             MR. WHELAN:  The law -- the law

23   would be the term -- the --

24             THE COURT:  What is the

25   definition of --

1          MR. WHELAN:  -- terminal

2     operator's duty --

3          THE COURT:  What is an --

4          MR. WHELAN:  -- with respect to

5     reasonable care.

6          THE COURT:  What is an approach?

7     I asked you what is an approach.  Is that a

8     question of law or fact?

9          MR. WHELAN:  I think it's a

10    question of fact, the approach itself,

11    based upon testimony.

12         THE COURT:  No.  The definition

13    of an approach --

14         MR. WHELAN:  Approach.

15         THE COURT:  -- the definition of

16    an approach is a question, it has to be, of

17    law; right?  It has to be.

18         MR. WHELAN:  Yes.

19         THE COURT:  And when you look at

20    the Nautilus case, it says -- when I'm

21    looking at what you are supposedly gleaning

22    from, you talk about "...duty extends to a

23    ship's right to enter, use, and exit a

24    wharfinger's dock facilities without being

25    exposed to dangers that cannot be

Page 47

1    avoided by reasonably prudent navigation

2    and seamanship."  So entering means somehow

3    you've got to get there from where you are

4    in the river.

5              And then you look at Sonat

6    Marine, which was a District Court case

7    from New Jersey in '85, affirmed by us in

8    '86, "...the approach extends only to the

9    berth and to the approach to the berth and

10   not to adjacent areas," whatever that

11   means.

12             And then another case from the

13   Fifth Circuit:  "It does not extend to

14   hazards merely in the vicinity."  So it may

15   mean is something outside the approach?

16   That's what it would seem to mean.

17             Western Bulk Carriers, which you

18   just cited, found no negligence where the

19   ship grounded on a shoal several hundred

20   feet west of the port, which was an area

21   well beyond what reasonably could be deemed

22   to be an approach.  So I don't see how

23   Western Bulk really helps you.

24             MR. WHELAN:  Well, it does --

25             THE COURT:  And it seems to me

Page 48

1      that it comes back to the amicus brief

2      where counsel says on Page 21:  "The most

3      logical place for the start point of the

4      approach to the CARCO berth is the point at

5      which vessels leave the channel and begin

6      maneuvering towards the berth.  It is at

7      that point where the risks particular to

8      the port transition to the risks particular

9      to the berth."

10                  MR. WHELAN:  Well --

11                  THE COURT:  What's wrong with

12     that?

13                  MR. WHELAN:  What's wrong with

14     that, Your Honor, is the Federal Anchorage

15     No. 9 is part of the same federal Delaware

16     River project as the channel.  It's no

17     different.  It's a public waterway.  It has

18     to be dredged and maintained by the Army

19     Corps of Engineers to 41 feet.

20                  There's 673 vessels in the four

21     years before this accident anchored in that

22     anchorage, many of which didn't come to

23     CARCO.  Just in 2004, before this incident,

24     141 vessels used that public anchorage.

25                  So that public anchorage, Federal

1      Anchorage No. 9, where vessels that don't

2      even come to CARCO's berth/anchor, cannot

3      be considered an approach.  It's actually

4      part of the navigable Delaware River

5      project and it's only the area inside of

6      that anchorage boundary that CARCO would be

7      responsible for.

8                    THE COURT:  So your position --

9                    THE COURT:  Well, what's to --

10                   THE COURT:  Okay.  I'm sorry.

11                   Your position is that because

12     other ships can also use the anchorage,

13     that it by definition can't be part of the

14     approach for a particular ship that's

15     approaching your berth?

16                   MR. WHELAN:  That's correct, Your

17     Honor.  The -- these are -- this is a

18     public waterway that's maintained by the

19     Army Corps of Engineers, a federal

20     anchorage, part of the Delaware River

21     project.

22                   THE COURT:  But --

23                   MR. WHELAN:  It's not part of our

24     berth and therefore it cannot be an

25     approach --

Page 50

1          THE COURT:  All right.

2          MR. WHELAN:  -- to the berth.

3          THE COURT:  But the cases that

4    you cited, it's clear that control would

5    seem to be a sufficient condition for

6    defining the area that -- of

7    responsibility.  But it -- but I don't see

8    anything in the cases that say it's a

9    necessary condition to define the area of

10   responsibility, and yet that's what you

11   want us to say.

12          MR. WHELAN:  No.  I think the

13   cases do rely on the area that is

14   maintained and controlled, the actual berth

15   area.  And, for example, in Western Bulk,

16   the same argument was made.  You have the

17   berth area that was maintained and in the

18   control of that port, and then when the

19   vessel left -- and necessarily the vessel

20   had to go through this federal project in

21   Western Bulk to get down the river to get

22   to the Pacific Ocean, they had to go

23   through this -- you can't argue -- the

24   Court rejected the argument that that would

25   be an approach.

1          THE COURT:  Yeah.  But in Western

2     Bulk they discussed three cases that

3     considered defining "approach," but

4     ultimately concluded that since the ship

5     grounded in the shipping channel, it was,

6     quote, in an area well beyond what could

7     reasonably --

8          THE COURT:  Right, exactly.

9          THE COURT:  -- be deemed to be an

10    approach to any of the port -- and it's

11    Port of Stockton's -- berths.  That seems

12    to be at odds with what you're telling us.

13          MR. WHELAN:  I believe it's the

14    same thing.  That was several hundred feet

15    from their berth area and it was not

16    considered an approach.  It's no different

17    than from it -- to the adjacent

18    anchorage that was part of the federal

19    project, just like the channel in Western

20    Bulk.  The approach can -- is -- the

21    approach cannot be considered to be the

22    area outside the immediate berth area.

23          THE COURT:  Let me -- let me

24    shift gears with you on the negligent

25    misrepresentation claim.  Is it possible

Page 52

1    that a master would become more cautious in

2    the anchorage upon learning that the draft

3    at the berth that he was nearing had just

4    been decreased by 2 feet; in other words,

5    from 38 to 36, and you know the draft of

6    this boat is 36.6 or 36.7?

7              MR. WHELAN:  Your Honor, the easy

8    answer to that question is, as Judge Fullam

9    found, as a matter of fact, that -- and he

10   rejected this post-incident speculation

11   based upon the credibility of the witnesses

12   that he heard testify -- in this case the

13   chief officer -- the master and the second

14   officer transited the Delaware River

15   erroneously believing they were transiting

16   at a high tide when they were actually

17   transiting at dead low tide.  And the fact

18   that those two -- that the master and the

19   chief officer or the second officer ignored

20   publicly available tidal information,

21   crucial to safety of navigation --

22              THE COURT:  But wait a minute.

23   At 8:40 on the 26th didn't you give the

24   okay it was all right to come in?

25              MR. WHELAN:  No, Your Honor.  In

1   the morning when CARCO, as Judge Fullam

2   found as a matter of fact, made no

3   decisions with respect to navigation.  All

4   of those decisions were made by the

5   navigators aboard that vessel and --

6              THE COURT:  But wasn't there

7   somebody --

8              MR. WHELAN:  -- the pilot aboard

9   that vessel.

10              THE COURT:  When the boat

11   initially pulled up, wasn't there

12   another -- was there another boat in that

13   entity -- in the berth?

14              MR. WHELAN:  No, Your Honor.  The

15   berth was clear.

16              THE COURT:  At that point.

17              MR. WHELAN:  At a -- at a point

18   before that.  The berth was clear.  All

19   that CARCO as a terminal operator does --

20   they make no navigational decisions -- is

21   they say our berth is clear.

22              THE COURT:  But --

23              MR. WHELAN:  It's up to the

24   master and the pilot to make all of the

25   decisions on whether a safe transit can be

1    made based upon -- they're the experts in

2    this area based upon the navigational

3    information available to them, one of which

4    is tidal information.  And they in making

5    their decision in this case --

6              THE COURT:  At 8:40 it was -- it

7    was what? low tide coming -- progressing

8    toward high tide?

9              MR. WHELAN:  All that we know is

10   that at 12:20, when they left, when they

11   decided to go, it was in absolute -- they

12   followed the dead low tide all the way up

13   the river.  And if navigators are ignoring

14   that kind of --

15             THE COURT:  But what was -- what

16   was -- I'm asking at 8:40 p.m., what was --

17   what was the tide at that point?

18             MR. WHELAN:  It was still -- it

19   was just the beginning -- it was just the

20   beginning of coming up from -- from low.

21             THE COURT:  And how much

22   difference is there between high and low

23   tide?

24             MR. WHELAN:  It's almost 6 feet

25   in the Delaware River and in Federal

1    Anchorage No. 9.  And so if -- if the chief

2    officer, second officer, and the master

3    would not even respond to publicly

4    available tidal information, Judge Fullam

5    found properly that they certainly wouldn't

6    have --

7              THE COURT:  But if --

8              MR. WHELAN:  -- responded to --

9              THE COURT:  But if you were -- if

10   you were a master and you thought that the

11   tide or the draft clearance was 38 feet,

12   not knowing that it had just been reduced

13   by 2 feet four days earlier to 36 feet, and

14   you knew that your hull had a draft of 36.6

15   or 36.7, that's just --

16             MR. WHELAN:  But --

17             THE COURT:  -- arithmetic, isn't

18   it?

19             MR. WHELAN:  But, Your Honor, I

20   think you have to look, first of all, that

21   there's three elements to this claim.

22   There has to be a misrepresentation.  There

23   has to be causation.  There has to be

24   reliance.

25             Well, in this particular

1    situation, you have to look at the

2    particular language set forth in that port

3    manual that they're relying on.  It's an

4    indication of -- and you have to look at

5    the wording.  It says "38 maximum draft at

6    the berth at the time of the revising of

7    this document.  It may change from time to

8    time and it should be verified before

9    arrival."

10                   THE COURT:  But --

11                   MR. WHELAN:  None of those --

12                   THE COURT:  -- why wasn't that

13    information given out to those who might --

14    like masters, because there's been a change

15    and you make the call, if you want, but

16    here's what it is:  We've decreased the

17    draft because of shoaling from 38 to 36.

18                   MR. WHELAN:  Well, in fact, there

19    was no change because an exception was

20    made --

21                   THE COURT:  Well, there was an

22    internal memorandum on the 22nd of

23    November, was there not?

24                   MR. WHELAN:  Yes, there was, Your

25    Honor; and it was --

1          THE COURT:  And what did that

2     say?

3               MR. WHELAN:  And as -- that the

4     maximum draft at the berth was being

5     reduced from 38 feet to 36 feet.  But as

6     Judge Fullam found as a matter of fact,

7     that was an internal policy by CARCO that

8     had to do with shoaling outside of the area

9     that was -- that the vessel would sit.  In

10    this --

11              THE COURT:  Well, that's because

12    he defined the approach so narrowly.

13              MR. WHELAN:  Well, in this

14    particular case -- this didn't deal with

15    approach.  This policy has to do with when

16    the ship is actually secured to the berth.

17    And that exception by Mr. Rankine was done

18    with full notice that ten days before a

19    vessel called the NEW RIVER had come into

20    CARCO with a draft of 36.11, went through

21    an entire tidal set -- cycle while being

22    loaded, and left at 37.3.  These are drafts

23    deeper than the ATHOS I.  And it was safely

24    there.  There was plenty of water.

25              THE COURT:  But the tide may

1      have -- also may have been different.  I

2      mean --

3                    MR. WHELAN:  Well, Your Honor --

4                    THE COURT:  -- why wouldn't --

5      just in terms of how we analyze this, why

6      wouldn't we go and take a look at the Hand

7      formula in the Carroll Towing case from '47

8      which says that you look at three

9      variables: probability of harm, the gravity

10     of the resulting injury, and the burden of

11     adequate precautions?

12                   The probability of harm, we don't

13     know, because, I mean, it's unclear because

14     a lot of other boats had gone through

15     perhaps at other variations of the tide.

16                   The gravity of the resulting

17     injury, well, there was significant injury,

18     it was a significant oil spill and damage

19     to the hull.

20                   And the burden of adequate

21     precautions -- and that's really what I'm

22     focusing on here -- because if you knew

23     that there was a problem four days before

24     and basically this boat on the 26th, as I

25     understand it from the record, is the last

1    one of the season to go through, one might

2    make an argument that you're just sort of

3    saying, okay, let's just get through this

4    and we'll worry about it next season, and

5    you knew that there was a difference of

6    2 feet and yet nobody else was told about

7    it.

8                MR. WHELAN:  Your Honor, first of

9    all, it's not depth; it's maximum draft.

10   You cannot tell anything about navigational

11   safety from maximum draft.  The maximum

12   draft goes from the water line to the

13   bottom of the keel.  It's up to the vessel

14   navigators to know the depth of water.

15                So this has nothing -- as Judge

16   Fullam found, this did not affect the depth

17   that was available in the anchorage, which

18   was safe.

19                THE COURT:  Well, was the master

20   looking at charts that showed a draft of

21   38 feet?

22                MR. WHELAN:  The draft -- the

23   master was looking at a navigation chart

24   that had depths as low as 34 feet, 35 feet,

25   in this general region.

Page 60

 1                    THE COURT:  So the master --

 2                    MR. WHELAN:  And based --

 3                    THE COURT:  -- should have known

 4      of the recent discovery of the shoaling?

 5                    MR. WHELAN:  No.  The master

 6      should have prepared a port-to-port passage

 7      plan where it takes into account depth from

 8      berth to berth, and that's the requirement

 9      of the federal regulations, and he has to

10      know that safety information for navigation

11      and depth is crucial.  And this particular

12      document did not mention anything about

13      depth.  It was draft.  And, in any event,

14      the exception was granted.

15                    Also, this had nothing to do with

16      the incident.  This is --

17                    THE COURT:  You've got to, okay,

18      educate me here then.  Let's just -- if a

19      draft is from the water line to the bottom

20      of the hull and it's 36.6 or 36.7 and the

21      memo on the 22nd talks about because of

22      shoaling, the draft -- isn't it correct --

23      the draft is being reduced from 38 to 36?

24                    MR. WHELAN:  Yes.  But that's the

25      draft of the vessel from the water line to

Page 61

1      the keel of the vessel.  It's not water

2      depth.  There's underkeel clearance beneath

3      that.  So it's not a representation as to

4      depth within the anchorage -- I mean within

5      the berth.  And, in any event --

6                    THE COURT:  What do you think the

7      master would have done had he known the

8      information on the 26th that you knew on

9      the 22nd?

10                    MR. WHELAN:  The master would not

11     have done anything, and this is based upon

12     the evidence at trial.  He would not have

13     relied on it because, first of all, it's

14     not depth information, it can't be relied

15     on for safety of navigation; and, secondly,

16     he disregarded the most important

17     information about tides, so who would

18     believe that he would even consider draft

19     information that really can't give him any

20     help in preparing a safe berth-to-berth

21     passage plan?

22                    And, more importantly, on this

23     issue, the incident occurred -- and similar

24     to the comments in the Nautilus case --

25     outside the berth area; and as Nautilus

1        found, that things that happen within the

2        berth area can have -- cannot be a cause or

3        a proximate cause, in fact, of something

4        that happened outside the berth area.  And

5        in this particular -- and these are facts

6        and they stated -- the Court stated that

7        those are factual findings.

8                    In this case Judge Fullam made a

9        specific factual finding that this incident

10       happened outside the berth area and that

11       there was no cause in facts or proximate

12       cause, and that should be given deference

13       under the Nautilus decision.

14                   THE COURT:  May I ask about that

15       warranty?

16                   THE COURT:  Yeah, sure.  Go

17       ahead.

18                   THE COURT:  I want to turn you to

19       the warranty before you sit down.  With

20       respect to the contract claim, as it

21       relates to the warranty, do you concede

22       that the concept of port is broader than

23       the concept of berth combined with

24       approach?

25                   MR. WHELAN:  In terms of the

1    warranties?

2                    THE COURT:  Yes.

3                    MR. WHELAN:  Well, it's a safe

4    port/safe berth warranty.  The port -- safe

5    port warranty would apply to the Port of

6    Paulsboro.  That would include the area in

7    and around Paulsboro.

8                    The berth, again, would be

9    when -- and the cases show -- is when the

10   ship is actually alongside the berth.

11                   THE COURT:  Okay.  So putting

12   aside what the nature of the guarantee is

13   or nature of the warranty is and whether

14   the Fifth Circuit or the Second Circuit

15   approach is more appropriate, and putting

16   aside whether CARCO was negligent, would

17   you agree that in this case the port would

18   encompass the anchorage?

19                   MR. WHELAN:  Yes.

20                   THE COURT:  Okay.  So -- so then

21   the question becomes if it does encompass

22   that area, that this whole geographic

23   analysis as to approach is not really

24   relevant to the -- to the question of the

25   warranty; correct?

1          MR. WHELAN:  The approach

2     argument is limited to the wharfinger

3     negligence cause of action.

4               THE COURT:  Okay.  Right.

5          MR. WHELAN:  And in this case we

6     don't even get to any of these contractual

7     warranties because there's no privity of

8     contract and Frescati had their own

9     separate contract with Star that had its

10     own safe berth/safe port warranty.

11               THE COURT:  But assuming we think

12     that they are a beneficiary of this

13     warranty, then the question really becomes:

14     If that's the case, if we ever get there,

15     then is it a negligence standard or is it

16     something stricter; right?

17               MR. WHELAN:  If the warrant --

18     if -- if you assume that there's a

19     third-party beneficiary status, which there

20     should not be --

21               THE COURT:  Just assume that for

22     purposes --

23               MR. WHELAN:  Right.

24               THE COURT:  -- of this question.

25               MR. WHELAN:  -- then you never --

Page 65

1    there still can be no liability because the

2    port was found safe as a matter of fact

3    based on historical safe usage, 673 vessels

4    in four years, 141 in the year before the

5    accident; and, in any event, even if you

6    get past that -- and that's a finding of

7    fact and conclusion of law on the part of

8    Judge Fullam -- even if you get past that,

9    there's the named port exception.

10                   This master knew he was coming to

11   Paulsboro.  He had been here before.

12   Tsakos had been here 14 times before, to

13   this terminal.  And they're in the best

14   position under the named port doctrine as

15   navigators.

16                   THE COURT:  So talk to me about

17   this safety finding.  I mean, it was, yes,

18   the Judge said the port was safe.  There

19   were not very many specific findings as to

20   why he was saying that, but he did say in a

21   half page that the port was safe.

22                   It's difficult to determine

23   whether or not he was measuring that by

24   some definition of port that was more

25   narrow than what you've just agreed to.

1           Is it clear that when he was

2      defining the port to be safe, he was

3      defining the port as broadly as you just

4      have?

5           MR. WHELAN:  Well, he -- because

6      his findings on the safety of the port were

7      based upon the safe anchoring of vessels,

8      673 during the four years before the

9      incident, and those are the factual --

10     those are the facts and the evidence that

11     the Judge considered, in addition to no

12     prior incidents within CARCO's berth that

13     had anything to do with --

14          THE COURT:  Okay.  If we were to

15     adopt the Second Circuit approach rather

16     than the Fifth Circuit approach, does that

17     objective finding of safety still prevent a

18     finding in favor of Frescati?

19          MR. WHELAN:  Yes, it does.

20          THE COURT:  Okay.

21          MR. WHELAN:  And --

22          THE COURT:  Explain that.

23          MR. WHELAN:  Because it's a --

24     the port is considered to be safe as a

25     matter of fact and a matter of law based on

1    prior usage.

2              THE COURT:  Okay.  So that what

3    you're saying is that strict liability

4    doesn't mean strict liability against any

5    possible accident; it means strict

6    liability to the extent that the port's not

7    safe under some objective measure?

8              MR. WHELAN:  That's correct; and,

9    also, if there's not strict liability, even

10   under the Second Circuit rule, because

11   negligent navigation would be a complete

12   defense to a safe port/safe berth warranty

13   under the Second Circuit rule, and that's

14   the reason why the Orduna case is a better

15   standard, because it recognizes the policy

16   problem with having a strict warranty.

17             The -- the better approach,

18   because it -- because that -- a strict

19   warranty would discourage or have

20   navigators rely on the warranty, and

21   they're the ones on the scene and they're

22   the ones best-suited to assess the port and

23   berth and to make quick decisions, on-scene

24   decisions.

25             THE COURT:  If I understand

```
 1      contract law, if I invite you to my house
 2      and I give you a warranty that you will be
 3      safe, that's -- that's something beyond
 4      just mere negligence, for me not taking
 5      care of something.  I'm saying to you, I'm
 6      telling you, if you come, you'll be safe,
 7      if you take this particular approach.
 8                   MR. WHELAN:  Well --
 9                   THE COURT:  Why is --
10                   MR. WHELAN:  -- in this area of
11      law, in the charter party area of the law,
12      it's not an absolute warranty.  Even the
13      strictest standard, which would be the
14      Second Circuit approach, negligent
15      navigation is a complete defense if it's
16      causative to that warranty.  And then there
17      isn't any warranty at all under Orduna,
18      it's a due diligence standard; and, in any
19      event, the named port doctrine extinguishes
20      the warranty.  That is the effect of that
21      doctrine.
22                   THE COURT:  But we don't have to
23      get to any of this on the contractual level
24      if we determine, different from you, what
25      an approach is and that you had a
```

1    responsibility, for example, to let people

2    know of the November 22 memorandum if,

3    indeed, that's negligence.

4              MR. WHELAN:  Well, Your Honor, I

5    think in both those instances, taking the

6    first part, there was no misrepresentation.

7              THE COURT:  No.  I understand.

8              MR. WHELAN:  None of the --

9              THE COURT:  But I'm saying, we

10    don't have to get -- if we determine that

11    there was no intent to have a warranty

12    given by CARCO to Frescati because CARCO

13    had given it to Star Tankers so Star

14    Tankers could make the claim but not

15    necessarily Frescati if you don't believe

16    in the third-party beneficiary intent here,

17    then you don't get to any of these issues

18    we were just talking about.

19              MR. WHELAN:  That's -- that's

20    correct.

21              THE COURT:  Okay.  Anything

22    further?

23              THE COURT:  No.

24              MR. WHELAN:  Thank you.

25              THE COURT:  Mr. Greenbaum.

1          MR. GREENBAUM:  Your Honors,

2     first I would like to respond to Judge

3     Greenaway's two questions.

4          The first was whether the

5     approach changes for each vessel.  The

6     answer basically is no.  Every vessel that

7     comes into CARCO's berth on the flood tide

8     is required to take exactly the same path,

9     and that was CARCO's testimony, as well as

10    the testimony of all of the nautical

11    witnesses, including the pilots.

12         That's 90% of the ships that go

13    to CARCO.  And it's my understanding the

14    other 10% of ships are also pushed in

15    sideways by tugs.  The only difference is

16    they don't have to turn around.  Therefore,

17    I don't know whether they might start their

18    approach a little bit more downriver or a

19    little bit more southerly than the ships

20    that turn around do.

21         But if that's so, first of all,

22    it would only add a little bit of width to

23    the area that has to be inspected; and,

24    secondly, whether we know where they

25    normally navigate or not, I think a berth

Page 71

1     owner has a duty to the 90% of its ships

2     that come in on precisely the same path.

3     There is no other path.

4              Now, your second question, Judge

5     Greenaway, is how far was the channel from

6     the berth, and the answer is it was less

7     than 2,000 feet.

8              Now, to put that in perspective,

9     CARCO's berth is 1,000 feet long.  The

10    berth is the water next to the jetty or the

11    pier.  It's not the pier itself.  It was

12    1,000 feet long because it was designed to

13    accommodate ships up to 1,000 feet.  So a

14    distance of 2,000 feet or less certainly is

15    not disproportionately far from a

16    1,000-foot parking space.

17             THE COURT:  All right.  Let me

18    turn you to the issue of the finding that

19    Judge Fullam made that the port was

20    objectively safe; and, admittedly, it

21    wasn't the longest, most detailed finding,

22    but it was -- it was very firm and said

23    based on all the evidence I find as a

24    matter of law that the port was safe.

25    Doesn't that create problems for you with

1    respect to both causes of action?

2            MR. GREENBAUM:  No.  He -- he --

3    the Judge found the port was safe in two

4    respects.  One, he said it's generally

5    safe.  I don't know what the heck that

6    means.  I mean, if it was safe 2 miles

7    up -- this is a 2.2-mile long anchorage --

8    if it was safe 2 miles away, that has

9    nothing to do with our case.

10            His second finding is that the

11    port was safe for a vessel that had a draft

12    of 36 foot 7 inches going to CARCO, and

13    what he didn't say is -- but it must be

14    implied is at the beginning of the flood

15    tide.

16            All the witnesses, first of all,

17    agreed, even the experts agreed that a

18    draft of 36 feet 7 inches is proper; and

19    they all agreed it's proper to approach at

20    the beginning of the flood tide, including

21    Captain Rankine, the port captain for CARCO.

22            But the Judge never made a

23    finding about the ATHOS' draft.  If the

24    ATHOS' draft was, in fact, 36 feet 7 inches

25    and if it was, in fact, proper to approach

1    the berth at the beginning of the flood

2    tide and if the ship struck the anchor, the

3    berth was ipso facto unsafe because --

4            THE COURT:  So your --

5            MR. GREENBAUM:  -- the

6    definition --

7            THE COURT:  Your theory is that

8    it's an absolute guarantee against any

9    accidents.

10           MR. GREENBAUM:  I won't use the

11   word "absolute" because it doesn't apply,

12   first of all, to the captain's negligence.

13   If there is supervening or contributing

14   negligence, then the damages can be either

15   divided or disallowed altogether.

16           It also is not a guarantee

17   against what the textbooks and cases call

18   abnormal events.  An abnormal event isn't

19   the mere fact that this ship alone hit the

20   anchor.  Some of the witnesses -- one

21   witness said this was an accident waiting

22   to happen.  An abnormal event is a weather

23   event, an earthquake in a place where there

24   aren't earthquakes, a riptide in a place

25   where there aren't riptides, an unexpected

1    war -- this is an English case --

2    unexpected hostilities between Iran and

3    Iraq that prevented a ship from leaving the

4    Port of Basra, things like that.

5                THE COURT:  What -- what is

6    the -- in discussions with Mr. Whelan we

7    talked about the difference between depth

8    and draft.  Can you talk about that?

9                MR. GREENBAUM:  Yes.  I was going

10   to respond to counsel's comments about

11   that.

12               First of all, it doesn't make

13   sense to say that telling us the safe

14   allowable draft for a ship doesn't tell you

15   anything about depth.  Of course it does.

16   It means the depth is deeper than the safe

17   allowable draft.

18               And, in fact, CARCO had a policy

19   of requiring at least 1 foot of underkeel

20   clearance, clearance between the bottom of

21   the ship and the riverbed at its berth, 1

22   foot.  So that means the depth at its berth

23   had to have been at least 39 feet in terms

24   of what it was representing to the ship.

25               If I'm responding to the things

1        that they said on facts, facts which have

2        to go back on remand, but I can't help but

3        say these things.  First of all, there

4        was -- there was no -- there were no areas

5        where the depth was 34 to 35 feet.  I don't

6        know where that comes from.

7                   The shallowest depth in the

8        general area on the charts is 38 feet, and

9        the master and the docking pilot both

10       testified, the master asked the docking

11       pilot about that and the docking -- he

12       asked about it because the project depth

13       was 40 feet.  And the docking pilot said

14       we're not going to go anywhere near that,

15       don't worry about it.  So the master was

16       very careful.

17                   Sorry; I can't read my

18       handwriting.

19                   THE COURT:  That's okay.

20                   MR. GREENBAUM:  Oh --

21                   THE COURT:  Join the --

22                   MR. GREENBAUM:  What --

23                   THE COURT:  Join the club.

24                   MR. GREENBAUM:  -- this nonsense

25       about the -- about the instructions or the

1    port manual saying please check to see if

2    the -- if the safe draft had changed.

3              Well, first of all, the ship got

4    these instructions two days before it went

5    in.  Nobody's going to check on that.  And,

6    secondly, it's deficient as a matter of law

7    because there -- as we've discussed at

8    length, a berth owner has an affirmative

9    obligation to warn about risks, about

10   hazards.

11             And, finally, on this point of

12   facts, the Court made no rulings about

13   draft, depth, seamanship, or any of that

14   sort of thing.  This is all for remand.  I

15   don't know why so much time was spent on

16   it.

17             THE COURT:  You -- earlier, when

18   I asked you that question, you said we

19   could review the record and make all these

20   factual --

21             MR. GREENBAUM:  No, no, no, no,

22   no.  No.  The record --

23             THE COURT:  You did say it,

24   but --

25             MR. GREENBAUM:  Yes, but not

1    about --

2              THE COURT:  -- maybe you've

3    changed your mind.

4              MR. GREENBAUM:  Not about that

5    subject.  No, not about that subject.  I

6    made that clear in the briefs.  No.  The

7    subject I was talking about was the -- what

8    was the approach to CARCO's terminal.

9              Now, the question that you asked

10   and I was diverted on was -- no.  I'm

11   sorry; I did respond to it.

12             THE COURT:  Right.

13             MR. GREENBAUM:  Judge Greenaway,

14   your other question I hadn't actually

15   completed answering, about the distance of

16   1,000 feet and maybe that doesn't -- or

17   2,000 feet, and maybe that doesn't bother

18   the panel so forgive me if I'm -- if this

19   is overkill.

20             But the nautical witnesses

21   testified on this subject.  In fact, they

22   testified kind of spontaneously in their

23   own words.  They weren't being asked about

24   is this a big distance.

25             But Captain Bolton, the owner's

Page 78

1    expert nautical witness, talked about the

2    place where the ship turned out of the

3    channel and he said -- and I guess I really

4    should quote it -- he said:  "It was within

5    2,000 feet of the terminal, immediate

6    vicinity of the terminal," and that was

7    what I would call a spontaneous

8    exclamation.  We weren't trying to promote

9    a definition of "approach."  And that

10   you'll find at 293 of the Joint Appendix.

11            And then the manager of the

12   Docking Pilots Association, Captain

13   Quillin, was talking about Billingsport

14   Range, which is where the docking pilot

15   took the conn, and then took the ship a

16   few -- a short distance further into the

17   Mifflin Range before he started his turn.

18   Anyway, the docking -- the manager of the

19   Docking Pilots Association said:  "That's

20   the range that's right there by CITGO," and

21   that was at -- I can't read my writing --

22   it's either 87 or 871 of the Joint

23   Appendix.

24            Now, on this question that

25   counsel raised about public waters.  By

1    definition, every approach is a navigable

2    water and every navigable water is subject

3    to the federal jurisdiction and therefore

4    is a public waterway.  But obviously the law

5    is that every such navigable water should

6    be inspected by the berth owner if that

7    navigable water is in an approach.

8             THE COURT:  Thank you very much.

9    Really, thank you to all counsel for

10   well-presented arguments and also very

11   well-done briefs.

12            We'd like to ask counsel to have

13   a transcript prepared of this oral argument

14   and to have the costs split evenly between

15   Frescati and CARCO but not have the

16   Government participate in that payment.

17            Thank you very much.

18                    - - -

19

20

21

22

23

24

25

Page 80

1                          - - -

2              C E R T I F I C A T I O N

3                          - - -

4

5          I, Susan Marie Migatz, RMR, CRR, do hereby

6     certify the foregoing is a true and correct

7     transcript from the official electronic sound

8     recording of the proceedings in the above-entitled

9     matter.

10

11

12

13

14
                                        9-28-12

15     _____        _____

16     SUSAN MARIE MIGATZ, RMR, CRR                DATE

17

18

19

20

21

22

23

24

25

**A**

**able** 26:15
**abnormal** 73:18,18
    73:22
**aboard** 53:5,8
**above-entitled**
    80:8
**absolute** 54:11
    68:12 73:8,11
**absolutely** 14:20
**accident** 32:4
    48:21 65:5 67:5
    73:21
**accidents** 73:9
**accommodate**
    71:13
**accorded** 21:11
**account** 12:25 60:7
**action** 32:24 64:3
    72:1
**actual** 5:8 13:24
    35:2 50:14
**add** 6:16 70:22
**addition** 28:11
    66:11
**address** 4:2
**adequate** 58:11,20
**adjacent** 36:17
    38:17 40:25
    47:10 51:17
**admittedly** 71:20
**adopt** 14:2 40:16
    66:15
**Advisory** 15:23
    28:12
**affect** 59:16
**affidavit** 15:6
**affiliate** 24:1
**affirmative** 76:8
**affirmed** 47:7
**agree** 14:14 20:17
    20:20 32:15
    42:24 63:17
**agreed** 17:22 31:9
    45:17 65:25
    72:17,17,19

**agreement** 31:3,8
    32:6
**ahead** 4:16 62:17
**akin** 30:20
**al** 2:3 3:4,6
**alleged** 32:13
**allowable** 74:14,17
**alongside** 43:16
    63:10
**alternative** 23:2
**altogether** 73:15
**AMBRO** 1:16
**America** 1:10 2:7
**American** 24:16
    24:18
**amicus** 30:21
    32:17 36:22 48:1
**analysis** 63:23
**analyze** 58:5
**analyzing** 6:2
**anchor** 7:1 14:19
    14:24,25 15:3
    16:7,9,23 19:23
    26:22 30:16,18
    73:2,20
**anchorage** 6:4,6
    8:3,12,13 10:20
    11:2,3,8 12:5
    15:21 18:11
    19:22 26:13,16
    27:6,17 28:2,6
    29:1,3,17,19 30:8
    31:24 32:3,20
    33:10 34:23,24
    35:2,12,14 38:18
    38:23 39:14,21
    44:6,20 45:8,9,10
    45:14 48:14,22
    48:24,25 49:1,6
    49:12,20 51:18
    52:2 55:1 59:17
    61:4 63:18 72:7
**anchored** 45:13
    48:21
**anchoring** 66:7
**and/or** 19:5

**Anne** 2:6 26:8
**announce** 3:2
**answer** 19:15,16
    19:17 33:11,18
    52:8 70:6 71:6
**answering** 77:15
**Anyway** 78:18
**Apart** 8:25
**appeal** 24:9 27:17
**appealed** 23:24
    24:9 25:14
**Appeals** 1:2 26:1
**APPEARANCES**
    2:1
**appears** 9:5,20
    41:7
**Appellant** 2:6
**Appellants** 2:2
    3:21
**Appellate** 2:7
**Appellees** 2:9 36:2
**Appendix** 28:5
    32:7 43:3 78:10
    78:23
**applies** 25:24
**apply** 23:12 39:2
    63:5 73:11
**applying** 39:3
**approach** 4:19,20
    4:24 5:6,8,20 6:3
    6:14,21,22 7:3,6
    7:9,14 9:24 11:10
    11:11,12,23 12:4
    13:9,12,24 14:11
    14:13 34:5,15
    35:10,13 36:7,10
    36:12,23 37:3,13
    37:17,23 38:5,12
    39:23 40:3 41:5,9
    41:14 42:5,15
    43:4,9,14,21
    44:22 45:20 46:6
    46:7,10,13,14,16
    47:8,9,15,22 48:4
    49:3,14,25 50:25
    51:3,10,16,20,21

    57:12,15 62:24
    63:15,23 64:1
    66:15,16 67:17
    68:7,14,25 70:5
    70:18 72:19,25
    77:8 78:9 79:1,7
**approaches** 36:20
**approaching** 41:15
    41:16 49:15
**appropriate** 25:25
    36:6 63:15
**arbitrated** 25:22
**arbitration** 4:11
    25:25
**area** 8:1,17 13:4
    14:18 18:11 29:6
    30:14 34:14
    35:14,18 36:14
    36:14,17 38:4,15
    39:12 40:24
    41:11,23 42:13
    42:16 43:4 45:4
    47:20 49:5 50:6,9
    50:13,15,17 51:6
    51:15,22,22 54:2
    57:8 61:25 62:2,4
    62:10 63:6,22
    68:10,11 70:23
    75:8
**areas** 35:2 39:16
    39:16 40:4 47:10
    75:4
**argue** 11:13 17:24
    32:9 40:12 50:23
**argued** 24:10
**arguing** 36:2
**argument** 1:15
    7:13 27:16 30:20
    50:16,24 59:2
    64:2 79:13
**arguments** 79:10
**arithmetic** 55:17
**Army** 48:18 49:19
**arrival** 56:9
**aside** 63:12,16
**asked** 13:17 46:7

    75:10,12 76:18
    77:9,23
**asking** 16:25 32:25
    33:6,13 40:11
    54:16
**Asphalt** 1:12 3:5
**asserting** 31:11
**assess** 67:22
**Association** 78:12
    78:19
**assume** 10:7,8
    64:18,21
**assuming** 29:8
    64:11
**ATHOS** 1:6,7
    17:14 36:25
    43:17 57:23
    72:23,24
**attached** 27:11
**authority** 30:12
**available** 52:20
    54:3 55:4 59:17
**Avenue** 2:3,7
**average** 18:21
**avoided** 47:1
**awfully** 36:18

**B**

**back** 5:19 7:2
    37:21 45:15 48:1
    75:2
**ballast** 20:11
**bar** 31:10
**barge** 19:7
**based** 18:5 31:11
    33:20 46:11
    52:11 54:1,2 60:2
    61:11 65:3 66:7
    66:25 71:23
**basically** 20:9,12
    30:13 41:11
    58:24 70:6
**Basra** 74:4
**beginning** 17:20
    54:19,20 72:14
    72:20 73:1
**begins** 6:14

**behalf** 36:2
**believe** 25:25 29:5
   39:20 51:13
   61:18 69:15
**believing** 52:15
**beneath** 61:2
**beneficiary** 21:12
   23:3 25:9 64:12
   64:19 69:16
**benefit** 22:14,15
   22:16
**berth** 4:2 5:3,11,12
   5:15,24 7:6,23
   8:13 9:7,10,15,22
   9:24 10:4 13:7,8
   13:9,12,13,16
   14:5 15:14 16:2
   18:17 21:17 28:1
   28:3,6 34:15
   35:13 36:13,14
   36:20 37:1 38:2,4
   39:4,22 41:12,21
   42:13 43:4,8 44:1
   44:4,21 45:2,4
   47:9,9 48:4,6,9
   49:15,24 50:2,14
   50:17 51:15,22
   52:3 53:13,15,18
   53:21 56:6 57:4
   57:16 60:8,8 61:5
   61:25 62:2,4,10
   62:23 63:4,8,10
   66:12 67:12,23
   70:7,25 71:6,9,10
   73:1,3 74:21,22
   76:8 79:6
**berths** 4:4 51:11
**berth-to-berth**
   61:20
**berth/anchor** 49:2
**berth/safe** 64:10
**best** 65:13
**best-suited** 67:22
**better** 5:18 67:14
   67:17
**beyond** 25:18

47:21 51:6 68:3
**Biezup** 2:9 36:1
**big** 34:18 77:24
**Billingsport** 43:18
   78:13
**BIMCO** 36:22
**bit** 41:25 42:4
   70:18,19,22
**BLANK** 2:2
**boarded** 43:17
**boat** 19:22,23 52:6
   53:10,12 58:24
**boats** 58:14
**Bolton** 77:25
**bother** 77:17
**bottom** 19:22 20:1
   20:5,9 59:13
   60:19 74:20
**boundary** 49:6
**breach** 22:7 31:2
**breached** 31:8
**brief** 10:18 18:24
   36:22 40:12 48:1
**briefs** 11:25 13:19
   36:4 77:6 79:11
**bring** 31:9
**broad** 44:22
**broader** 62:22
**broadly** 41:9 66:3
**brought** 16:1
**Building** 2:4
**Bulk** 37:5 38:11
   39:11 40:9 47:17
   47:23 50:15,21
   51:2,20
**Bunge** 23:15 25:16
**burden** 58:10,20
**Burnett** 13:6 37:20
**business** 4:3 7:24
**busy** 29:10
**but-for** 19:10
────────────
         **C**
C 80:2,2
**call** 19:10 56:15
   73:17 78:7
**called** 19:7 22:2

57:19
**captain** 72:21,21
   77:25 78:12
**captain's** 73:12
**CARCO** 7:15 8:23
   9:1,12 13:4 17:13
   17:18 19:6 21:8
   21:10,17 29:2,20
   30:5 32:21 36:4
   37:1 39:12,16
   40:20 42:1,13
   48:4,23 49:6 53:1
   53:19 57:7,20
   63:16 69:12,12
   70:13 72:12,21
   74:18 79:15
**CARCO's** 5:23
   15:14 16:2 17:11
   18:15 33:7 49:2
   66:12 70:7,9 71:9
   77:8
**care** 14:18 26:16
   27:25 42:10,12
   46:5 68:5
**careful** 18:1 75:16
**cargo** 19:7 20:10
**Carriers** 47:17
**Carroll** 58:7
**carry** 13:21
**case** 3:2 4:15,21,23
   5:12,17,18 6:13
   6:23 7:7 10:13,19
   12:1 14:8,9 17:8
   21:16 22:20 23:5
   23:8,15,18 25:16
   36:3,15,19 37:5,5
   37:6,8,22 39:11
   41:22 43:16 45:5
   46:20 47:6,12
   52:12 54:5 57:14
   58:7 61:24 62:8
   63:17 64:5,14
   67:14 72:9 74:1
**cases** 5:9 10:18
   13:12 21:22,24
   22:1,2 23:12

25:19,22 37:15
   37:15,18,18 38:4
   39:8 40:2,8 42:17
   42:22 50:3,8,13
   51:2 63:9 73:17
**casualness** 17:11
**causation** 19:11,11
   55:23
**causative** 68:16
**cause** 14:16 19:13
   19:14 62:2,3,11
   62:12 64:3
**causes** 72:1
**causing** 16:10
**cautious** 52:1
**center** 20:10
**certain** 11:2
**certainly** 10:14
   14:9 55:5 71:14
**certify** 80:6
**chain** 4:9
**chance** 20:19
**change** 35:10 56:7
   56:14,19
**changed** 17:17
   76:2 77:3
**changes** 70:5
**channel** 5:14,20,23
   5:25 8:11 10:17
   14:5 19:3 29:10
   34:14 35:20
   36:19 37:1 44:1,4
   44:20 48:5,16
   51:5,19 71:5 78:3
**channel/around**
   44:19
**chart** 28:4 59:23
**charter** 25:21
   68:11
**charterer** 22:9
**charterer's** 4:3
**charts** 59:20 75:8
**check** 76:1,5
**chief** 52:13,19 55:1
**Chrysler** 2:4
**Circuit** 1:2 23:6

47:13 63:14,14
   66:15,16 67:10
   67:13 68:14
**circular** 42:3,4
**cite** 25:25 39:9
**cited** 5:9 10:18
   37:19 47:18 50:4
**CITGO** 1:12,12,13
   3:5 78:20
**CITGO's** 38:12
**claim** 11:7 17:10
   18:6 19:13 20:18
   20:21 21:2,7
   24:13 25:4,9
   31:13 51:25
   55:21 62:20
   69:14
**claims** 30:24,25
   31:9,21 33:3,8
   35:6
**clear** 6:19 19:20
   27:5 28:5 32:18
   50:4 53:15,18,21
   66:1 77:6
**clearance** 55:11
   61:2 74:20,20
**clearly** 14:21 16:13
   32:8
**close** 28:6 29:16
**closer** 23:6
**club** 75:23
**COAST** 1:13
**Code** 8:8
**colleague** 7:14
**collectively** 36:3
**collusion** 24:11
   25:7
**combined** 62:23
**come** 9:16 15:24
   17:20 29:18
   36:20 48:22 49:2
   52:24 57:19 68:6
   71:2
**comes** 28:1 35:11
   35:12 36:20 48:1
   70:7 75:6

**coming** 7:2 17:12
  17:15 27:24 54:7
  54:20 65:10
**comments** 61:24
  74:10
**commercial** 9:13
**Committee** 15:23
**Committees** 28:12
**common** 7:23 9:17
**companies** 24:19
**company** 1:5,12,23
  3:3,5,22 24:16,17
**compared** 34:19
**complete** 67:11
  68:15
**completed** 77:15
**completely** 31:16
**concede** 62:21
**concept** 62:22,23
**concerned** 5:13
  11:5
**concluded** 51:4
**conclusion** 40:16
  65:7
**conclusions** 12:12
**condition** 22:3
  50:5,9
**conn** 78:15
**connected** 43:5
**consider** 43:8
  61:18
**considered** 22:6
  49:3 51:3,16,21
  66:11,24
**consignee** 22:9
**constituted** 39:15
**constitutes** 11:8
**context** 21:15,16
**contract** 20:18
  21:7,7,9,15 22:22
  22:25 30:24,25
  31:21,22 32:5,10
  35:6 62:20 64:8,9
  68:1
**contractual** 64:6
  68:23

**contrary** 12:6
  14:22 16:20
**contributing** 73:13
**control** 8:16 13:11
  13:15,18 31:24
  32:2,19 38:22
  39:17 40:21
  41:22 50:4,18
**controlled** 42:13
  50:14
**CORPORATION**
  1:13,13
**Corps** 29:5,25 30:3
  48:19 49:19
**correct** 3:15,16 6:8
  19:16,17 26:20
  26:25 31:17
  37:10 45:21
  49:16 60:22
  63:25 67:8 69:20
  80:6
**correctly** 6:2,2
**costs** 79:14
**counsel** 4:6 45:18
  48:2 78:25 79:9
  79:12
**counsel's** 74:10
**counter** 7:13 23:14
**course** 4:7 23:5
  74:15
**Court** 1:2,23 3:1,9
  3:13,18,20,25 4:8
  4:16,18,19 5:1,4
  5:17 6:1,7,11,17
  7:4,7,12 8:14 9:3
  9:18 10:3,5,9,22
  11:4,11,12,16,22
  12:3,7,11,14,16
  12:20 13:2,23
  14:14 15:2,9 16:8
  16:12,24 17:3,6
  17:23 18:1,5,7,7
  18:9,10,10,14
  19:2,17,18 20:2,5
  20:14,23 21:5,20
  21:23 22:10,15

  22:19,24 23:8,19
  24:2,5,13 25:1,5
  25:15 26:1,2,5,8
  26:18 27:8,18,21
  28:15,18,20,22
  30:19 31:4,6,20
  32:12,25 33:24
  33:25 34:5,9,13
  35:7,21,22,24
  36:5,9,16 37:7,12
  37:21,22,25 38:6
  38:14,16,19 39:1
  39:6,20 40:1,11
  40:23 41:1,24
  42:3,20,21 43:25
  44:3,7,9,12,15,16
  45:12,15,24 46:3
  46:6,12,15,19
  47:6,25 48:11
  49:8,9,10,22 50:1
  50:3,24 51:1,8,9
  51:23 52:22 53:6
  53:10,16,22 54:6
  54:15,21 55:7,9
  55:17 56:10,12
  56:21 57:1,11,25
  58:4 59:19 60:1,3
  60:17 61:6 62:6
  62:14,16,18 63:2
  63:11,20 64:4,11
  64:21,24 65:16
  66:14,20,22 67:2
  67:25 68:9,22
  69:7,9,21,23,25
  71:17 73:4,7 74:5
  75:19,21,23
  76:12,17,23 77:2
  77:12 79:8
**Court's** 4:22
**create** 71:25
**credibility** 16:17
  16:19 52:11
**credible** 18:3
**crossed** 16:6
**CRR** 80:5,16
**crucial** 52:21

  60:11
**Crumady** 21:21
  22:19
**custom** 9:6,19
  26:12
**customarily** 5:10
  14:4
**cycle** 57:21

**D**

**damage** 16:11
  58:18
**damages** 20:23
  21:1 24:22 31:23
  32:5,11,13 73:14
**dangers** 8:17 46:25
**DATE** 80:16
**day** 29:10
**days** 55:13 57:18
  58:23 76:4
**de** 40:14
**dead** 52:17 54:12
**deal** 57:14
**dealing** 4:19
**debate** 11:6 19:16
**decided** 54:11
**decides** 19:17
**decision** 18:5
  22:12 39:10 54:5
  62:13
**decisions** 14:3 26:1
  41:18 53:3,4,20
  53:25 67:23,24
**decreased** 52:4
  56:16
**deemed** 47:21 51:9
**deeper** 57:23 74:16
**defense** 24:12
  31:11,20 67:12
  68:15
**deference** 62:12
**deficient** 76:6
**define** 36:9 42:9
  50:9
**defined** 36:12
  57:12
**defines** 42:5

**defining** 50:6 51:3
  66:2,3
**definition** 5:5 7:3
  11:23 37:13,17
  37:23 39:11,21
  41:8 43:12 44:17
  44:22 45:20,25
  46:12,15 49:13
  65:24 73:6 78:9
  79:1
**Delaware** 36:25
  43:23,24 48:15
  49:4,20 52:14
  54:25
**deliberately** 23:1,2
**delimit** 11:23
**demonstrates**
  17:11
**DEPARTMENT**
  2:6
**depend** 35:16
**depends** 35:16
**depth** 10:14,15
  18:19 59:9,14,16
  60:7,11,13 61:2,4
  61:14 74:7,15,16
  74:22 75:5,7,12
  76:13
**depths** 59:24
**derive** 28:16,22
**derived** 21:14
**designed** 71:12
**detailed** 71:21
**detect** 16:22
**determination**
  12:4 16:13,15
  17:1
**determinations**
  16:17
**determine** 65:22
  68:24 69:10
**determined** 22:10
**developed** 16:14
**dicta** 33:6
**dictum** 23:10,22
  23:23 25:10

**difference** 6:22
   54:22 59:5 70:15
   74:7
**different** 14:8,9
   16:17 20:24 42:8
   48:17 51:16 58:1
   68:24
**difficult** 19:14
   65:22
**diligence** 68:18
**direct** 22:22,25
**directly** 25:9
**disallowed** 73:15
**discourage** 67:19
**discovery** 60:4
**discussed** 41:10
   51:2 76:7
**discussions** 74:6
**disproportionat...**
   71:15
**disregarded** 41:4
   61:16
**distance** 44:8,8
   71:14 77:15,24
   78:16
**distinguished** 7:5
**District** 4:22 22:19
   27:18 31:20 47:6
**diverted** 77:10
**divided** 73:15
**dock** 13:13,14
   29:19 34:12,22
   35:20 38:9 40:25
   41:15,17 42:18
   46:24
**docking** 43:6,17
   75:9,10,11,13
   78:12,14,18,19
**doctrine** 65:14
   68:19,21
**document** 56:7
   60:12
**doing** 3:14 11:1,2
   30:5 34:15
**downriver** 70:18
**draft** 15:18 17:3

17:16,18 19:9
   52:2,5 55:11,14
   56:5,17 57:4,20
   59:9,11,12,20,22
   60:13,19,22,23
   60:25 61:18
   72:11,18,23,24
   74:8,14,17 76:2
   76:13
**drafts** 15:20 57:22
**dredge** 10:15 29:3
   29:7,13 30:13
   32:23
**dredged** 48:18
**dredges** 8:2
**dredging** 7:16,18
   7:19,20 10:16
   29:2,6,9,21,22
   40:21
**dropped** 26:21
**due** 68:18
**duty** 4:2 7:8,9,24
   8:21 9:17 13:3,22
   31:18,18 33:9
   39:13 41:20 42:5
   42:7,9,9,11 45:2
   46:2,22 71:1
**D.C** 2:8

_____
            **E**
_____
**E** 80:2
**earlier** 55:13 76:17
**earthquake** 73:23
**earthquakes** 73:24
**EAST** 1:13
**easy** 16:22 52:7
**edge** 8:11,12 44:20
**educate** 60:18
**effect** 23:9 27:23
   68:20
**eight** 18:23
**either** 19:5 73:14
   78:22
**electronic** 1:19
   80:7
**elements** 55:21
**encompass** 63:18

63:21
**engage** 33:6
**Engineers** 48:19
   49:19
**English** 25:24 74:1
**ensure** 7:10
**enter** 46:23
**entering** 47:2
**entire** 43:22 57:21
**entities** 27:3
**entity** 26:23 53:13
**entrance** 38:9
   42:17
**erroneous** 14:21
   16:13
**erroneously** 52:15
**error** 4:22 11:22
**especially** 32:17
**ESQ** 2:3,6,10
**establish** 40:20
**et** 2:3 3:4,6
**evenly** 79:14
**event** 60:13 61:5
   65:5 68:19 73:18
   73:22,23
**events** 73:18
**everybody** 17:22
   20:16 28:10
**evidence** 10:1,2
   14:22,23 15:7,10
   18:23 61:12
   66:10 71:23
**evidence/testimo...**
   16:21
**evident** 22:13
**exactly** 43:20 51:8
   70:8
**example** 36:15
   50:15 69:1
**exception** 56:19
   57:17 60:14 65:9
**exclamation** 78:8
**exclusive** 31:24
   32:19 38:22
**Excuse** 44:2
**exercised** 14:18

39:16 40:20
**exhibits** 42:15
**exist** 8:18
**exit** 38:9 42:18
   46:23
**EXONERATION**
   1:7
**expand** 37:16
   43:15 45:2
**expands** 45:7
**expert** 15:6 78:1
**expertise** 35:9
**experts** 54:1 72:17
**explain** 33:19,22
   66:22
**exposed** 46:25
**extend** 47:13
**extends** 46:22 47:8
**extent** 9:19 33:7
   67:6
**extinguishes** 68:19

_____
            **F**
_____
**F** 80:2
**face** 16:16
**facilities** 46:24
**fact** 4:21 7:21 8:21
   8:23,24,25 11:14
   11:24 12:8,12
   14:7 18:2,6 19:11
   21:17 24:15,20
   33:12 40:14 41:1
   45:19 46:8,10
   52:9,17 53:2
   56:18 57:6 62:3
   65:2,7 66:25
   72:24,25 73:19
   74:18 77:21
**facto** 8:25 73:3
**factor** 9:19 38:25
**facts** 4:23 11:22
   23:7 40:20 62:5
   62:11 66:10 75:1
   75:1 76:12
**factual** 62:7,9 66:9
   76:20
**factually** 26:17

**fair** 8:14
**far** 43:25 44:3,7,9
   71:5,15
**fault** 26:20,23,24
   27:2,4,10
**favor** 66:18
**favorably** 39:10
**federal** 7:22,25 8:3
   8:4,6,8 10:17,19
   10:21 11:1,2 30:8
   30:9,9 38:18
   39:14 44:6 45:9
   45:14 48:14,15
   48:25 49:19
   50:20 51:18
   54:25 60:9 79:3
**feeds** 44:24
**feet** 5:23,24 15:18
   15:20,20 17:16
   17:18 18:17,17
   44:12,14 47:20
   48:19 51:14 52:4
   54:24 55:11,13
   55:13 57:5,5 59:6
   59:21,24,24 71:7
   71:9,12,13,14
   72:18,24 74:23
   75:5,8,13 77:16
   77:17 78:5
**felt** 6:17
**Fifth** 47:13 63:14
   66:16
**filings** 32:17
**finally** 76:11
**find** 14:25 22:25
   23:3 25:18 71:23
   78:10
**finding** 12:6 14:17
   18:2 33:1 38:21
   40:13 62:9 65:6
   65:17 66:17,18
   71:18,21 72:10
   72:23
**findings** 12:8,12
   62:7 65:19 66:6
**fine** 3:25

**firm** 71:22
**first** 3:2 4:17 42:22
  44:6 55:20 59:8
  61:13 69:6 70:2,4
  70:21 72:16
  73:12 74:12 75:3
  76:3
**flexible** 14:6
**flood** 15:25 17:21
  70:7 72:14,20
  73:1
**focus** 21:6 41:19
  42:21
**focusing** 58:22
**followed** 40:19
  54:12
**following** 31:7,14
**foot** 72:12 74:19
  74:22
**forego** 31:22 32:4
**foregoing** 80:6
**foreign** 24:15
**forgive** 77:18
**formula** 58:7
**forth** 37:4 56:2
**found** 14:19,24
  22:20 27:9 36:13
  38:11 47:18 52:9
  53:2 55:5 57:6
  59:16 62:1 65:2
  72:3
**four** 48:20 55:13
  58:23 65:4 66:8
**framed** 44:17
**free** 13:20
**Frescati** 1:5 2:3
  3:3,22 21:9,11
  27:12,14 31:13
  64:8 66:18 69:12
  69:15 79:15
**Frescati's** 43:14
**front** 18:16
**full** 57:18
**Fullam** 36:12
  38:10,20,20 41:3
  43:20 52:8 53:1

55:4 57:6 59:16
  62:8 65:8 71:19
**further** 69:22
  78:16

_____

**G**

**gears** 51:24
**general** 21:4 59:25
  75:8
**generally** 10:24
  29:11 35:18 72:4
**genuine** 19:12
**geographic** 36:13
  41:20 63:22
**geographical**
  42:12
**getting** 29:21
  32:22 34:17
**give** 9:19 37:22
  52:23 61:19 68:2
**given** 14:16 32:17
  56:13 62:12
  69:12,13
**glean** 28:20
**gleaning** 39:7
  46:21
**go** 4:16 28:2 29:24
  37:21 42:20 43:1
  44:5 45:15 50:20
  50:22 54:11 58:6
  59:1 62:16 70:12
  75:2,14
**goes** 9:22 17:9
  59:12
**going** 9:16 14:9
  27:11 30:16 32:8
  32:12 35:18,19
  72:12 74:9 75:14
  76:5
**good** 3:13,19 25:8
  35:23,24
**Government** 4:5
  8:2,15,21 9:1,5,9
  27:9 28:8 29:12
  31:10,12,18,22
  32:9,18 33:2,3,16
  79:16

**Government's**
  26:20,24 27:2
  28:14
**granted** 60:14
**gravity** 58:9,16
**Greenaway** 1:16
  71:5 77:13
**Greenaway's** 70:3
**Greenbaum** 2:3
  3:7,8,19,21 4:1
  4:13,17 5:3,7,21
  6:5,9,15 7:17
  8:19 9:12,25 10:4
  10:7,12,23 11:10
  11:15,19 12:9,13
  12:15,18,24 13:5
  14:1,20 15:5,12
  16:9,19 17:2,5,9
  18:4,9,13 19:4,25
  20:3,7,22,25
  21:13,25 23:17
  23:21 24:3,6 25:3
  25:20 26:4 37:20
  69:25 70:1 72:2
  73:5,10 74:9
  75:20,22,24
  76:21,25 77:4,13
**ground** 26:14 27:7
  28:3,6 29:1,17
  30:8 33:10 34:24
**grounded** 47:19
  51:5
**grounds** 26:16
  27:17 31:24 32:3
  32:20
**guarantee** 40:10
  63:12 73:8,16
**guess** 25:16 27:8
  78:3

_____

**H**

**half** 15:18,20
  34:23 65:21
**Hand** 58:6
**handwriting** 75:18
**happen** 62:1 73:22
**happened** 12:16

62:4,10
**happens** 27:6,13
  29:15
**harbor** 14:10,11
  14:13
**hard** 31:6,14
**harm** 58:9,12
**hazards** 7:11,25
  8:9 13:10 47:14
  76:10
**hear** 35:5
**heard** 33:17 52:12
**heck** 72:5
**help** 17:8 61:20
  75:2
**helps** 17:8 47:23
**Henderson** 2:9
  36:1
**hide** 24:14
**high** 15:16,21 16:3
  16:3,4 19:5 52:16
  54:8,22
**hired** 22:8
**historical** 65:3
**hit** 19:23 73:19
**hold** 4:24
**holds** 45:5
**Hong** 25:23,23
**Honor** 3:17 27:1,7
  27:15 28:17
  31:16 33:5 36:11
  37:2,11 38:25
  43:11 44:23
  48:14 49:17 52:7
  52:25 53:14
  55:19 56:25 58:3
  59:8 69:4
**HONORABLE**
  1:16,16,17
**Honors** 26:10 35:5
  41:14 70:1
**hooked** 43:5
**hopefully** 19:19
**hostilities** 74:2
**hour** 16:2
**house** 68:1

**hull** 55:14 58:19
  60:20
**hundred** 47:19
  51:14

_____

**I**

**identical** 27:12
**ignore** 4:23 11:22
**ignored** 18:14
  52:19
**ignoring** 18:6
  54:13
**images** 30:6
**immaterial** 25:7
**immediate** 4:25
  7:5 36:14 38:3,8
  39:4,22,24 40:3
  42:17 45:4 51:22
  78:5
**immediately** 36:17
**immunity** 24:18
**implied** 22:22 38:2
  72:14
**imply** 11:20
**importance** 22:1
**important** 21:3
  28:9 32:16 33:15
  61:16
**importantly** 61:22
**improper** 41:2
**inches** 18:17,18
  72:12,18,24
**incident** 48:23
  60:16 61:23 62:9
  66:9
**incidents** 66:12
**include** 8:9 63:6
**includes** 21:17
**including** 15:1
  17:14 70:11
  72:20
**incoming** 15:25
**incorrect** 18:14
  26:17
**indemnity** 22:22
  25:4
**Independence**

2:10
**indication** 56:4
**industry** 27:24
28:7,11
**information** 12:3
52:20 54:3,4 55:4
56:13 60:10 61:8
61:14,17,19
**initially** 42:24
53:11
**injured** 22:5
**injury** 58:10,17,17
**inside** 49:5
**insisted** 19:6
**inspect** 7:24 13:8
13:20
**inspected** 70:23
79:6
**inspection** 9:24
**instance** 42:23
**instances** 18:18
69:5
**instructions** 75:25
76:4
**intend** 4:1
**intent** 21:10,14
22:13,15 23:20
69:11,16
**interesting** 22:18
25:15
**internal** 56:22 57:7
**internally** 17:17
**International**
36:22
**invite** 68:1
**invited** 9:15 13:9
**invitees** 4:3 7:25
**involved** 24:16
**in-depth** 9:23
**ipso** 8:25 73:3
**Iran** 74:2
**Iraq** 74:3
**irrelevant** 18:12
**issue** 14:16 17:25
19:12 21:3 29:5,9
31:2 41:1 61:23

71:18
**issues** 4:2 44:25
45:6 69:17

---

### J

**Jack** 2:3 3:20
**Jersey** 47:7
**jetty** 71:10
**Join** 75:21,23
**Joint** 28:5 32:7
78:10,22
**JOSEPH** 1:16
**JR** 1:16
**Judge** 12:20 13:1
22:20 26:19
36:12 38:10,19
38:20 40:13,19
41:3 42:23 43:20
52:8 53:1 55:4
57:6 59:15 62:8
65:8,18 66:11
70:2 71:4,19 72:3
72:22 77:13
**Judge's** 7:3 14:17
**judgment** 23:25
24:4,7
**judicial** 16:18
**jurisdiction** 8:6
79:3
**JUSTICE** 2:6

---

### K

**KATHLEEN** 1:17
**keel** 59:13 61:1
**kind** 54:14 77:22
**kinds** 35:17
**knew** 8:24 9:1
55:14 58:22 59:5
61:8 65:10
**know** 9:3,14,15
10:1,6,16,20,21
16:6,7 27:20 28:1
28:10 29:25 30:1
30:7,15 32:2
33:20,21 34:25
42:23 43:1,5
44:19 52:5 54:9

58:13 59:14
60:10 69:2 70:17
70:24 72:5 75:6
76:15
**knowing** 55:12
**known** 8:24 17:19
17:24 18:25 60:3
61:7
**knows** 30:1
**Kong** 25:23,24

---

### L

**L** 1:16
**language** 13:25
14:2 21:15,19
23:22 39:24 56:2
**lately** 25:23
**law** 4:22 7:23 8:20
9:17 11:7,18,21
12:12 25:24
33:11 37:3 45:5
45:19,19,22,22
46:8,17 65:7
66:25 68:1,11,11
71:24 76:6 79:4
**lean** 5:18
**learning** 52:2
**leave** 48:5
**leaving** 74:3
**left** 34:8 36:24,25
50:19 54:10
57:22
**legal** 11:21 37:4
39:20 40:16,18
41:20 42:5,7,9
45:2
**legally** 26:17
**length** 76:8
**let's** 36:5 37:21
42:20 45:15 59:3
60:18
**level** 8:16 68:23
**Lexington** 2:3
**liability** 1:8 45:7
65:1 67:3,4,6,9
**liable** 22:4 27:19
33:4

**lie** 34:11
**lightering** 19:8
**LIMITATION** 1:7
**limited** 4:24 38:12
42:12 64:2
**limiting** 5:2,4
**line** 59:12 60:19,25
**lines** 34:2
**list** 45:6
**little** 70:18,19,22
**loaded** 57:22
**local** 15:22
**logic** 31:14
**logical** 48:3
**London** 25:22
**long** 22:12 71:9,12
72:7
**longer** 15:8
**longest** 71:21
**longshoremen**
22:5
**look** 42:7,8 46:19
47:5 55:20 56:1,4
58:6,8
**looking** 46:21
59:20,23
**looks** 34:25
**loosely** 41:17
**lost** 34:17
**lot** 25:18 30:10
33:6 58:14
**Louisiana** 23:16
**low** 18:20,21 52:17
54:7,12,20,22
59:24

---

### M

**M** 1:17
**maintain** 7:8 32:19
**maintained** 42:14
48:18 49:18
50:14,17
**maintenance**
40:21 41:21
**making** 27:4,16
30:20 38:21 54:4
**manager** 1:6 78:11

78:18
**maneuver** 43:7
**maneuvering** 48:6
**manifestly** 22:11
22:13
**manual** 56:3 76:1
**Marie** 80:5,16
**Marine** 47:6
**Maritime** 15:23
28:12
**Market** 1:24
**master** 52:1,13,18
53:24 55:2,10
59:19,23 60:1,5
61:7,10 65:10
75:9,10,15
**masters** 56:14
**matter** 8:19 13:16
25:6 52:9 53:2
57:6 65:2 66:25
66:25 71:24 76:6
80:9
**maximum** 56:5
57:4 59:9,11,11
**mean** 4:9 5:22 11:6
12:20,21 18:20
21:6 23:9 26:21
27:3 29:8,20,25
31:7 32:11 34:16
34:21 41:7,10
42:4 43:21 47:15
47:16 58:2,13
61:4 65:17 67:4
72:6
**means** 8:1 36:23
41:2 47:2,11 67:5
72:6 74:16,22
**measure** 67:7
**measuring** 65:23
**memo** 17:16 60:21
**memorandum**
17:7 56:22 69:2
**mention** 60:12
**mentioned** 18:24
**mere** 68:4 73:19
**merely** 7:11 47:14

metaphysical 19:15,20
metaphysics 19:18
middle 29:9 35:1
MID-ATLANTIC 1:24
Mifflin 78:17
Migatz 80:5,16
mile 43:18
miles 41:16 72:6,8
mind 77:3
minimum 15:5
minute 6:12 23:16 52:22
minutes 3:24
misrepresentation 17:10 18:6 19:12 51:25 55:22 69:6
mixed 11:18 45:18
morning 3:19 35:23,24 53:1
Murphy 2:6 3:10 26:5,7,8,25 27:15 27:22 28:17,23 30:23 31:5,15 33:5 34:3,7,10,16 35:15
M/T 1:5

N

N 80:2
name 3:20
named 65:9,14 68:19
narrow 65:25
narrowly 57:12
NATIONAL 1:23
nature 63:12,13
nautical 19:21 70:10 77:20 78:1
Nautilus 7:7 37:4,8 37:8,22 38:7 40:8 46:20 61:24,25 62:13
navigable 8:5 49:4 79:1,2,5,7
navigate 70:25

navigation 47:1 52:21 53:3 59:23 60:10 61:15 67:11 68:15
navigational 30:14 30:18 53:20 54:2 59:10
navigators 53:5 54:13 59:14 65:15 67:20
near 75:14
nearing 52:3
necessarily 9:8 43:21 50:19 69:15
necessary 50:9
need 13:6 23:19 30:15
needed 13:21
negligence 21:2 22:5 31:12,25 32:14 33:2,7 42:6 47:18 64:3,15 68:4 69:3 73:12 73:14
negligent 32:9 51:24 63:16 67:11 68:14
never 64:25 72:22
New 2:4 25:22 47:7 57:19
Nobody's 76:5
nonsense 75:24
normally 43:3 70:25
North 2:10
nose 34:22
notice 57:18
notified 17:13
notion 26:11 33:8
November 17:7,17 56:23 69:2
novo 40:15
NY 2:4
N.W 2:7

O

O 80:2
objective 66:17 67:7
objectively 71:20
objects 15:1
obligated 13:8
obligation 28:14 76:9
obviously 11:6 22:24 79:4
occur 13:3
occurred 61:23
Ocean 50:22
odds 41:5 51:12
office 30:9
officer 16:18 52:13 52:14,19,19 55:2 55:2
official 80:7
offset 32:13
Oh 12:24 14:20 75:20
oil 1:13 58:18
okay 3:18 4:16,17 6:7,9 26:2 34:13 37:7 44:15 49:10 52:24 59:3 60:17 63:11,20 64:4 66:14,20 67:2 69:21 75:19
ones 67:21,22
on-scene 67:23
open 45:6
operator 45:3 53:19
operator's 46:2
opinion 12:22 23:11 38:2
opponents 11:9,13
opposing 7:13 45:17
oral 1:15 79:13
Orduna 67:14 68:17
Osprey 37:5 40:9
ought 26:14

outcome 4:14
outset 45:17
outside 5:19 35:8 41:12 45:3 47:15 51:22 57:8 61:25 62:4,10
overkill 77:19
owed 22:8
owner 1:5 7:23 9:7 9:10,22 13:7 21:18 22:4,17,21 22:23 23:4 32:21 38:3 41:21 71:1 76:8 79:6
owners 26:13
owner's 4:2 13:16 77:25
owner/terminal 45:3
O'Malley 1:17 42:23

P

PA 2:11
Pacific 50:22
page 28:4,24 32:7 37:25 43:2 48:2 65:21
Palmer 2:9 36:1
panel 77:18
Paragon 23:5,8,22 23:23,24 24:6,9 24:11,23 25:8,13
Paragon's 24:13
parking 30:10 71:16
part 22:6 28:13 34:6 48:15 49:4 49:13,20,23 51:18 65:7 69:6
participate 79:16
particular 12:1 13:4 21:16 41:22 48:7,8 49:14 55:25 56:2 57:14 60:11 62:5 68:7
party 25:21 26:22

30:24 68:11
passage 43:22 60:6 61:21
path 70:8 71:2,3
pathway 6:6 8:10 9:13,14,17 12:5 36:24
Paulsboro 63:6,7 65:11
payment 79:16
pending 4:14
Pennsylvania 1:25 2:7
people 22:8 69:1
perfectly 13:20
permit 7:16,17,19 7:20 29:3,6,13,21 29:22,24 32:23 42:2
permitted 38:15
permitting 30:3
person 19:21 26:23
perspective 71:8
Petition 1:4 3:3
PETRO 1:12
Philadelphia 1:25 2:11
physical 38:9 40:25 42:18
pick 26:11
piece 30:9
pier 13:14 17:12 17:15 71:11,11
pilot 43:17 53:8,24 75:9,11,13 78:14
pilots 70:11 78:12 78:19
pilot's 15:17
place 6:18 18:21 33:9 48:3 73:23 73:24 78:2
places 18:16
plain 21:19
plaintiffs 37:15,18
plan 60:7 61:21
play 22:3

**please** 3:20 26:6,7
   76:1
**plenty** 18:22 57:24
**point** 6:10 7:4
   24:21 27:8 32:16
   32:16 33:18
   36:24 43:13
   44:19 48:3,4,7
   53:16,17 54:17
   76:11
**pointed** 15:13
**pointing** 34:23
**policy** 30:20 44:25
   45:6 57:7,15
   67:15 74:18
**port** 4:4 20:11
   47:20 48:8 50:18
   51:10,11 56:2
   62:22 63:4,5,5,17
   64:10 65:2,9,14
   65:18,21,24 66:2
   66:3,6,24 67:22
   68:19 71:19,24
   72:3,11,21 74:4
   76:1
**port's** 67:6
**port-to-port** 60:6
**port/safe** 63:4
   67:12
**position** 6:16 33:23
   49:8,11 65:14
**possible** 51:25 67:5
**possibly** 33:9
**post** 30:9
**post-incident**
   52:10
**practice** 9:6,20
   26:12
**practices** 10:25
**precautions** 58:11
   58:21
**precisely** 71:2
**prepared** 60:6
   79:13
**preparing** 61:20
**presently** 45:5

**pretty** 27:23 35:13
**prevent** 30:5 32:21
   66:17
**prevented** 74:3
**previously** 17:13
**principle** 5:5
**prior** 66:12 67:1
**priority** 30:18
**privilege** 21:12
**privity** 64:7
**probability** 58:9
   58:12
**probably** 10:12,13
   15:21
**problem** 14:15
   29:11,21 41:13
   58:23 67:16
**problems** 71:25
**procedure** 17:22
**procedures** 25:13
**proceeding** 30:22
**proceedings** 1:19
   25:12 80:8
**process** 30:4
**produced** 1:19
**progressing** 54:7
**prohibitions** 10:25
**project** 7:22 8:1
   48:16 49:5,21
   50:20 51:19
   75:12
**promote** 78:8
**proper** 17:22
   72:18,19,25
**properly** 55:5
**property** 30:10
**proposing** 13:24
   13:25
**proximate** 14:16
   19:13,14 62:3,11
**prudent** 47:1
**public** 21:4 39:15
   43:15 45:8,9
   48:17,24,25
   49:18 78:25 79:4
**publicly** 52:20

55:3
**pulled** 53:11
**purposes** 8:7 64:22
**pushed** 6:20,24
   70:14
**put** 5:5,18,19 71:8
**putting** 63:11,15
**p.m** 54:16

---

**Q**

**question** 4:18,20
   11:7,13,18,21,24
   14:7 20:15 34:1
   35:8 42:25 45:19
   46:8,10,16 52:8
   63:21,24 64:13
   64:24 71:4 76:18
   77:9,14 78:24
**questions** 33:11,18
   70:3
**quick** 67:23
**Quillin** 78:13
**quite** 17:21 35:3
**quote** 51:6 78:4
**quote/unquote**
   31:23

---

**R**

**R** 80:2
**raised** 24:14 78:25
**range** 43:18 78:14
   78:17,20
**Rankine** 57:17
   72:21
**reach** 20:21 21:2
**reached** 37:1
**read** 44:18 75:17
   78:21
**reads** 23:10,23
**really** 28:5 30:10
   30:19 31:25
   47:23 58:21
   61:19 63:23
   64:13 78:3 79:9
**reason** 20:20 21:1
   23:11 24:8 25:20
   38:21 40:11

67:14
**reasonable** 46:5
**reasonably** 47:1,21
   51:7
**reasoning** 24:13
**rebuttal** 3:24
**received** 43:6
**recognize** 19:13
**recognized** 21:21
**recognizes** 67:15
**recommended**
   15:23
**record** 9:21 10:10
   12:2 16:14,16,18
   41:8 58:25 76:19
   76:22
**recorded** 1:19
**recording** 1:19
   80:8
**recover** 24:24,25
**recovered** 23:24
   24:4,6
**red** 36:15 41:23
   42:14
**reduce** 32:10,13
**reduced** 19:9
   55:12 57:5 60:23
**referred** 36:3
**Refining** 1:12 3:5
**region** 1:24 59:25
**regulated** 33:19
**regulations** 8:8
   30:3 60:9
**regulatory** 30:12
**rejected** 50:24
   52:10
**relates** 33:12,12
   42:6 62:21
**relating** 4:11
**relevant** 63:24
**reliance** 55:24
**relied** 61:13,14
**relieve** 7:23
**rely** 8:15,20 26:15
   28:7 50:13 67:20
**relying** 56:3

**remand** 75:2 76:14
**reply** 10:18
**REPORTING**
   1:23
**reports** 28:13
**represent** 3:21
   26:9
**representation**
   61:3
**representing** 74:24
**Republic** 24:7,7,11
   24:12,22,24
**request** 31:21
**required** 70:8
**requirement** 15:17
   60:8
**requires** 13:17
**requiring** 74:19
**reserve** 3:24
**respect** 14:15
   17:12 27:14
   39:14 46:4 53:3
   62:20 72:1
**respectively** 23:13
**respects** 8:3 72:4
**respond** 55:3 70:2
   74:10 77:11
**responded** 55:8
**responding** 74:25
**responsibility** 9:9
   9:11 50:7,10 69:1
**responsible** 27:4
   27:25 38:3 39:12
   49:7
**result** 43:19
**resulting** 58:10,16
**review** 11:5 16:18
   40:14 76:19
**revising** 56:6
**Richard** 2:10
   35:25
**right** 8:20 9:4 10:5
   10:17,19,22
   15:12 16:24 17:4
   17:5 18:16 23:4
   24:2 25:1 26:2

27:21 31:1 34:16
37:9 41:6,11
44:16 46:17,23
50:1 51:8 52:24
64:4,16,23 71:17
77:12 78:20
**rights** 10:24 27:10
**riptide** 73:24
**riptides** 73:25
**risks** 48:7,8 76:9
**river** 5:12 14:10
15:24 30:17
32:22 33:19
36:25 43:23,24
47:4 48:16 49:4
49:20 50:21
52:14 54:13,25
57:19
**riverbed** 74:21
**RMR** 80:5,16
**ROME** 2:2
**rule** 67:10,13
**ruling** 25:5,6 27:18
33:14,16
**rulings** 76:12

**S**

**safe** 4:4,4,19 7:9
7:10 17:15 53:25
59:18 61:20 63:3
63:4 64:10 65:2,3
65:18,21 66:2,7
66:24 67:7,12
68:3,6 71:20,24
72:3,5,6,8,11
74:13,16 76:2
**safely** 57:23
**safety** 52:21 59:11
60:10 61:15
65:17 66:6,17
**saw** 9:21
**saying** 6:12 16:12
25:2 27:24 28:7
41:11 44:21 59:3
65:20 67:3 68:5
69:9 76:1
**says** 29:2,12 32:8

32:11 36:23
46:20 48:2 56:5
58:8
**scan** 14:25
**scene** 67:21
**scope** 35:9 36:6,13
41:20 42:12
**se** 7:22
**seamanship** 47:2
76:13
**search** 8:17
**searching** 8:9
**season** 59:1,4
**second** 23:6 52:13
52:19 55:2 63:14
66:15 67:10,13
68:14 71:4 72:10
**secondly** 61:15
70:24 76:6
**Section** 2:7
**section/a** 6:5
**secured** 57:16
**see** 12:22 21:2
23:11 27:13
28:23,24,25 34:7
35:4 40:7 45:16
47:22 50:7 76:1
**sense** 32:20 74:13
**separate** 64:9
**SEPTEMBER**
1:17
**service** 1:19
**set** 37:3,4 56:2
57:21
**settled** 37:3
**settlement** 31:2,8
32:6
**seven-hour** 16:1
**shallow** 18:16
**shallower** 18:19
**shallowest** 75:7
**shift** 51:24
**ship** 6:19,24 7:21
14:11 17:19
18:19 20:13 22:4
22:21,23 23:4

24:23 36:18 43:7
47:19 49:14 51:4
57:16 63:10 73:2
73:19 74:3,14,21
74:24 76:3 78:2
78:15
**shipping** 1:5,6 2:3
3:3,22,23 51:5
**ships** 15:10,13,17
15:24 16:6,11
35:19 37:19
49:12 70:12,14
70:19 71:1,13
**ship's** 19:9 46:23
**shoal** 47:19
**shoaling** 56:17
57:8 60:4,22
**shoals** 18:16
**short** 78:16
**show** 63:9
**showed** 18:15
59:20
**shown** 42:15
**shows** 21:10
**side** 14:25 20:6,8
**sidebar** 22:18
**sideways** 6:20,24
70:15
**significant** 58:17
58:18
**similar** 61:23
**simply** 8:1 18:14
**sir** 3:8,12
**sit** 20:14 57:9
62:19
**situation** 56:1
**size** 34:19 35:3
**slightly** 20:8 44:13
**small** 35:3 36:18
**Smith** 13:6 37:19
**somebody** 53:7
**somewhat** 11:4
35:16
**sonar** 14:24
**Sonat** 47:5
**sorry** 8:4 11:12

24:4,21 28:17
40:1 49:10 75:17
77:11
**sort** 19:15 29:24
30:4 59:2 76:14
**sound** 1:19 80:7
**sounds** 25:11
**southerly** 70:19
**sovereign** 24:18
**space** 71:16
**specific** 33:14 62:9
65:19
**specifically** 13:3
32:11 34:19 40:9
**specified** 8:7,7
**speculation** 52:10
**spent** 76:15
**spill** 58:18
**split** 79:14
**spontaneous** 78:7
**spontaneously**
77:22
**spot** 15:11
**Square** 2:10
**squiggly** 34:2
**stage** 17:15
**standard** 11:5 14:7
37:4 40:19 64:15
67:15 68:13,18
**Star** 4:10,11 21:8,9
64:9 69:13,13
**starboard** 6:13
36:19
**start** 6:18 36:5
48:3 70:17
**started** 78:17
**starting** 43:7
**state** 25:12
**stated** 62:6,6
**statement** 18:2
**States** 1:2,10 2:6
3:5 26:9,15 27:19
28:9 33:17,22
**static** 35:14
**status** 4:11 64:19
**stayed** 4:14,14

19:3
**stern** 20:4,12
34:22
**stevedore** 21:24
22:1,6,8,23 23:18
**stevedores** 22:2
**stevedoring** 23:12
**stipulated** 15:7
**Stockton's** 51:11
**Street** 1:24
**strict** 67:3,4,5,9,16
67:18
**stricter** 64:16
**strictest** 68:13
**struck** 6:25 20:9
73:2
**structure** 38:10
40:25 42:19
**subject** 8:6 77:5,5
77:7,21 79:2
**submit** 12:7,11
24:12 29:13
**subrogee** 27:11
**subset** 6:3 34:6
**sued** 33:2
**sufficient** 12:3
50:5
**sufficiently** 16:14
**suggested** 8:22,23
14:23
**Suite** 1:24 2:11
**supervening** 73:13
**supposed** 31:20
**supposedly** 15:2
46:21
**Supreme** 21:20
22:10,24
**sure** 10:6 27:5
28:10 62:16
**surrounding** 39:15
40:4
**surroundings** 7:10
**survey** 10:14,15,20
13:4 18:15 26:13
28:12 29:23,25
30:13 34:4

surveying 11:3
32:23
surveys 18:20
Susan 80:5,16
suspect 35:15
swung 34:11
S.A 1:6

**T**

T 80:2,2
take 6:13 18:21
19:6 26:15 37:18
43:14 44:18 58:6
68:7 70:8
takes 60:7
talk 46:22 65:16
74:8
talked 74:7 78:1
talking 10:24 43:9
69:18 77:7 78:13
talks 36:16 60:21
tank 20:10,10,11
Tankers 4:10,12
69:13,14
technically 35:10
tell 17:6 35:9 59:10
74:14
telling 40:15 42:8
51:12 68:6 74:13
ten 57:18
term 45:23
terminal 26:12
29:16 32:21 45:7
46:1 53:19 65:13
77:8 78:5,6
terminals 11:1
terminal's 34:8
terms 27:16 35:2
58:5 62:25 74:23
test 13:23 39:2,3
testified 75:10
77:21,22
testify 52:12
testimony 29:18
41:4 42:25 46:11
70:9,10
textbooks 73:17

thank 26:3,4 33:24
35:21 69:24 79:8
79:9,17
theory 22:21 32:1
73:7
thing 9:4 30:14
34:17 51:14
76:14
things 29:1 35:1,17
62:1 74:4,25 75:3
think 6:18 12:3
15:15,19,22
18:23 20:15
21:13,20 22:19
23:22 30:6,25,25
33:7,18 34:3 43:3
45:16 46:9 50:12
55:20 61:6 64:11
69:5 70:25
THIRD 1:2
third-party 21:11
23:3 25:8 64:19
69:16
THOMAS 1:16
thought 55:10
three 3:24 15:6,14
23:13 51:2 55:21
58:8
tidal 52:20 54:4
55:4 57:21
tide 15:25,25 16:3
17:16,21 52:16
52:17 54:7,8,12
54:17,23 55:11
57:25 58:15 70:7
72:15,20 73:2
tides 35:16 61:17
time 19:8 31:7,14
56:6,7,8 76:15
times 65:12
time's 35:4
today 3:2,14
told 59:6
top 34:8
tort 20:21
touched 16:7,10

Towing 58:7
Trading 1:6 3:23
transcript 1:15,19
79:13 80:7
transcription 1:19
transit 5:11,14
53:25
transited 52:14
transiting 52:15,17
transition 48:8
travel 14:4
traversed 35:19
trial 22:20 26:19
61:12
triangle 36:15
38:13 41:23
42:14
triangular 40:22
trigger 13:3,7
trip 16:1
true 8:10 27:1 80:6
truth 29:4
trying 37:16 43:14
78:8
Tsakos 1:6 3:22
65:12
tugboats 6:25 43:6
tugs 6:13,20 36:19
43:6,16 70:15
turn 6:12 16:16
33:8 36:18 62:18
70:16,20 71:18
78:17
turned 39:3 78:2
two 23:12 25:19
52:18 70:3 72:3
76:4
type 9:23

**U**

ultimately 51:4
unclear 58:13
underkeel 61:2
74:19
understand 4:5 6:1
12:19 17:23 25:1
31:15 58:25

67:25 69:7
understanding
70:13
unexpected 73:25
74:2
unfortunate 25:12
unique 4:21
United 1:2,10 2:6
3:4 26:9,15 27:19
28:9 33:17,22
unknown 26:22
unrebutted 29:4
unsafe 73:3
unseaworthy 22:3
unstated 24:21
unusual 29:16
upriver 5:14 14:4
usage 65:3 67:1
use 9:13,13 13:25
43:12 46:23
49:12 73:10
user 32:22
usual 14:12
usually 12:22
U.S 2:6

**V**

v 3:5
variables 58:9
variations 58:15
various 8:7 14:2
verified 56:8
VERITEXT 1:23
versus 37:20
vessel 5:10 14:3
22:4,14,16,16
28:25 34:10,20
34:21 35:3,11
41:15 43:22
50:19,19 53:5,9
57:9,19 59:13
60:25 61:1 70:5,6
72:11
vessels 9:16 13:10
17:12,13 29:18
30:2 45:7,10 48:5
48:20,24 49:1

65:3 66:7
vicinity 4:25 7:6
7:11 39:4,22 40:3
40:5 47:14 78:6
view 23:1
vs 1:11

**W**

wait 23:16 27:13
52:22
waited 18:1 19:5
waiting 73:21
waived 24:18
Walker 3:15
want 6:17 20:16
50:11 56:15
62:18
wanted 6:10 7:3
35:5
wants 30:1
war 74:1
warn 7:10,24 13:9
76:9
warrant 64:17
warranties 63:1
64:7
warranty 4:4,7
22:7 62:15,19,21
63:4,5,13,25
64:10,13 67:12
67:16,19,20 68:2
68:12,16,17,20
69:11
Washington 2:8
wasn't 18:3 26:19
26:24 27:2 53:6
53:11 56:12
71:21
water 13:13 15:16
15:22 16:3,4
18:20,21 19:5
57:24 59:12,14
60:19,25 61:1
71:10 79:2,2,5,7
Waterman 21:22
22:14
waters 5:10 7:22

8:1 14:2,3 39:15
40:4 43:15 78:25
**waterway** 8:5
48:17 49:18 79:4
**waterways** 27:5
**way** 9:14 31:19
43:24 54:12
**weather** 73:22
**weeds** 34:18
**well-developed**
12:2
**well-done** 79:11
**well-presented**
79:10
**went** 15:14,21 16:4
57:20 76:4
**weren't** 77:23 78:8
**west** 2:11 47:20
**Western** 37:5
38:11 39:10 40:9
47:17,23 50:15
50:21 51:1,19
**we'll** 3:1 59:4
**we're** 5:13 10:24
27:16,24 30:24
75:14
**we've** 5:9 13:19
56:16 76:7
**wharfinger** 7:8
64:2
**wharfinger's**
46:24
**whatsoever** 14:23
**Whelan** 2:10 3:11
3:12,16 35:22,23
35:25,25 36:8,11
37:2,10,14,24
38:1,8,15,17,24
39:5,9,19,23 40:2
40:17,24 41:13
42:1,11 43:11
44:2,5,10,13,23
45:13,22 46:1,4,9
46:14,18 47:24
48:10,13 49:16
49:23 50:2,12

51:13 52:7,25
53:8,14,17,23
54:9,18,24 55:8
55:16,19 56:11
56:18,24 57:3,13
58:3 59:8,22 60:2
60:5,24 61:10
62:25 63:3,19
64:1,5,17,23,25
66:5,19,21,23
67:8 68:8,10 69:4
69:8,19,24 74:6
**width** 5:24 70:22
**witness** 16:22
73:21 78:1
**witnesses** 18:23
43:1 52:11 70:11
72:16 73:20
77:20
**word** 37:23 41:14
73:11
**wording** 25:11
56:5
**words** 5:8 52:4
77:23
**work** 11:1,2
**worry** 59:4 75:15
**wouldn't** 16:16
18:25 33:3 55:5
58:4,6
**writing** 78:21
**wrong** 11:17 48:11
48:13
**wrote** 7:7

---

**Y**

**Yeah** 17:23 23:19
31:4 51:1 62:16
**year** 65:4
**years** 15:4,14
23:12,13,15
48:21 65:4 66:8
**York** 2:4 25:22
**YPF** 23:25 24:3,8
24:9,10,14,15,17
24:21,23,25 25:9

---

**1**

**1** 74:19,21
**1,000** 5:24 71:9,12
71:13 77:16
**1,000-foot** 71:16
**10%** 70:14
**10174** 2:4
**11-2576** 1:6 3:4
**11-2577** 1:11 3:6
**12:20** 54:10
**1258** 28:4,16,22,24
34:1
**14** 65:12
**141** 48:24 65:4
**15** 12:21
**16** 10:20
**16-page** 12:22
**18** 16:5
**1800** 1:24
**1801** 1:24
**190** 2:10
**19103** 1:25
**19106** 2:11

---

**2**

**2** 52:4 55:13 59:6
72:6,8
**2,000** 5:23 71:7,14
77:17 78:5
**2.2-mile** 72:7
**20** 1:17
**2000** 45:10
**2001** 15:1
**2004** 45:11 48:23
**2012** 1:17
**20530** 2:8
**21** 48:2
**22** 15:15 17:7 69:2
**22nd** 17:17 56:22
60:21 61:9
**26th** 52:23 58:24
61:8
**269** 43:2
**293** 78:10

---

**3**

**3** 18:17

**31** 15:19
**34** 59:24 75:5
**35** 59:24 75:5
**36** 17:18 18:17,17
52:5 55:13 56:17
57:5 60:23 72:12
72:18,24
**36.11** 57:20
**36.6** 17:4 52:6
55:14 60:20
**36.7** 17:4 52:6
55:15 60:20
**37** 15:18,20,20
**37.3** 57:22
**38** 17:16 52:5
55:11 56:5,17
57:5 59:21 60:23
75:8
**39** 74:23

---

**4**

**40** 75:13
**401** 2:11
**405** 2:3
**41** 48:19
**47** 58:7

---

**6**

**6** 54:24
**60** 41:16
**62** 25:16
**673** 45:10 48:20
65:3 66:8

---

**7**

**7** 20:10,11,12
72:12,18,24
**71** 15:13
**74** 25:17
**7644** 2:7

---

**8**

**8:40** 52:23 54:6,16
**85** 47:7
**86** 47:8
**87** 78:22
**871** 78:22

---

**9**

**9** 10:22,23 18:18
39:14 45:9,14
48:15 49:1 55:1
**90%** 70:12 71:1
**900** 44:12,14
**95** 32:7
**950** 2:7
**96** 37:9